**JAMESBURY CORPORATION, Plaintiff,**

v.

**WORCESTER VALVE COMPANY, Inc.,**
Defendant,
and
**E. W. Bliss Company, Intervener.**
Civ. A. No. 65–348–G.

United States District Court,
D. Massachusetts.

Oct. 15, 1970.

1

**2**

———◆———

Robert F. Conrad, Washington, D. C., Warren C. Lane, Jr., Charles Donelan, Bowditch, Gowetz & Lane, Worcester, Mass., William L. Ericson, James E. Mrose, Boston, Mass., for plaintiff.

Charles E. Goodhue, III, Joseph L. Cotter, Goodwin, Proctor & Hoar, Boston, Mass., Elliott I. Pollock, Washington, D. C., for defendant.

Daniel Blackhurst, Robert Vickers, James H. Tilberry, Cleveland, Ohio, John P. Sullivan, Jerome Preston, Jr., John G. S. Flym, John W. Tilson, Foley, Hoag & Eliot, Boston, Mass., for intervener.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

The original complaint in this case was brought by Jamesbury Corporation against Worcester Valve Company, Inc., for infringement of United States letters patent No. 2,945,666 ball valve ("patent '666"), which was issued to Jamesbury Corporation on July 19, 1960 as assignee of Howard G. Freeman and Oscar R. Vaudreuil named on the patent as the inventors. E. W. Bliss Company was permitted to intervene on the ground that the patent in suit rightfully be-

longed to it because derived from an invention made by Howard G. Freeman while he was employed by Bliss's predecessor company, Rockwood Sprinkler Company of Worcester, as director of research and under a contractual obligation to disclose and assign to Rockwood all inventions or improvements made while so employed. Bliss's claim of equitable ownership of the patent was severed and tried separately without a jury. At the trial of this third party action and in the briefs intervener Bliss has been referred to as the plaintiff and Jamesbury Corporation as the defendant.

### Findings of Fact

1. The patent in question concerns a ball valve of the type used to control the flow of fluids through a pipe. Ball valves were among the products manufactured by Bliss's predecessor, Rockwood Sprinkler Company, whose assets were acquired by Bliss and which is now operated as a division of the Bliss Company. The ball valves which were manufactured by Rockwood while Freeman was employed there utilized a seat or seal[1] on only one side of the ball, sometimes referred to as a "jam seat", meaning that the ball was jammed by a spring or other device against an opposing seat, the resulting compression forming a seal. This design was successful commercially but had the disadvantage of being able to control the flow of fluid adequately only in an installation in which the fluid always flowed in the same direction. Also the seat sometimes had a tendency to swell and this permitted leakage from the valve and might make it difficult to turn.

2. In 1945 and thereafter Rockwood customers occasionally requested a ball valve capable of controlling the flow of fluid in either direction. For this purpose a double-seated ball valve would be necessary. Such a valve was never manufactured by Rockwood while Freeman was its director of research. Upon leav-

---

1. The terms seat and seal are used interchangeably herein, referring to somewhat different functions of the identical object.

ing Rockwood, Freeman became president of Jamesbury Corporation, which was organized for the purpose of manufacturing double-seated ball valves. Within a few weeks Freeman forwarded to the new corporation's patent counsel sketches and specifications embodying the invention on which patent '666 eventually issued on July 19, 1960.

3. Freeman, a Worcester resident, joined Rockwood in 1940 following his graduation from Worcester Polytechnic Institute as a mechanical engineer. He was appointed as director of research and had approximately six employees under his supervision. His department was primarily responsible for designing and improving all of Rockwood's products. While with Rockwood he made 19 inventions on which United States patents were issued. He was responsible for determining whether or not an idea was sufficiently novel to warrant submission to Rockwood's patent counsel and as part of his duties he submitted such ideas to them on many occasions. He was not required to obtain prior approval from any other company official before doing so. He was included in the company's "key man" program under which company executives received bonuses based upon company earnings. When he left Rockwood in January 1954 his compensation, including bonuses, was approximately $25,000 annually.

4. In a written employment agreement with Rockwood dated August 28, 1940, Freeman agreed "to give to Rockwood the full benefit and enjoyment of any and all inventions or improvements which he may make while in the employ of Rockwood * * * and all inventions which are made or worked out on the time and at the expense of Rockwood. * * * Said Freeman further agrees that he will without additional consideration disclose promptly to Rockwood all of the above-described inventions or improvements * * *."

5. Plaintiff Bliss first learned that it might have a claim to ownership of patent '666 in May 1966 when it heard about testimony given and drawings produced by Freeman on a deposition taken December 21, 1965 in a patent infringement action Jamesbury Corporation had instituted against the United States in the Court of Claims, Docket No. 189-63.[2] Freeman deposed that he first conceived of the ball valve described in the patent application about the first week of February 1954 and that one of the problems in ball valves which he had been thinking about was that they were unable to operate successfully in both directions of flow. Asked to describe the approach he took to solve this problem, he stated, " * * * I just dreamed about it, I suppose, and made sketches until the idea popped up." Asked at what stage he felt he had developed a solution to the problem, he stated, "After the idea developed I made some sketches, and promptly made them up. I say 'promptly', and I mean in the next few weeks. * * * " At a deposition on January 4, 1966 in another case pending in a federal court in Ohio, Freeman again identified some drawings showing aspects of his invention as having been made by himself on February 1 and February 2, 1954.

6. In the fall of 1953, while still director of research at Rockwood, Freeman decided to go into business for himself if he could persuade investors to contribute the necessary venture capital. He had formed the opinion that a patentable, double-seated ball valve having seats whose edges or lips would perform the sealing function, could be developed and marketed commercially. He discussed the matter frequently with a friend, Reck, who obtained commitments of approximately $60,000 from prospective investors whom Reck told to post-date their checks as of February 2, 1954 so that they would bear a date subsequent to the formation of the new company.

2. Therefore the applicable statute of limitations, Mass.G.L. c. 260, §§ 2, 12, is no bar to plaintiff's claim. Stetson v. French, 1947, 321 Mass. 195, 198–199, 72 N.E.2d 410; Tracerlab, Inc. v. Industrial Nucleonics Corp., 1 Cir. 1963, 313 F.2d 97, 102.

Freeman did not tell anyone in authority at Rockwood about his plans or efforts to raise capital.

7. After capital in the proposed new company had been arranged for, Freeman set the stage for an amicable resignation from Rockwood. On January 13, 1954 he told Rockwood's president, Carroll, that he was contemplating resigning unless he received a salary increase which would double or triple his annual compensation. It was left that they would discuss the matter early the following week. On January 20, Freeman sent Carroll a letter of resignation by registered mail proposing January 30 as the effective date but stating that a reasonably later or earlier date would also be satisfactory. On January 25, Carroll called Freeman to his office and they agreed to part company and that Freeman would be paid through the 30th (Sunday the 31st was the last day of the month). Carroll suggested that Freeman leave that afternoon and, having reviewed affairs in the research department with his assistant Johnson while in Carroll's office, Freeman departed after they wished each other lots of luck.

8. Although Freeman was paid until January 30, and thereafter received a bonus on the basis of having worked two-thirds of the company's fiscal year and was available and willing to do any work Carroll might have requested during the remainder of the week, his employment at Rockwood terminated on January 25, 1954. Freeman was not on salary; his compensation was based on a compensation plan geared to business volume and company profits; payments were made to him biweekly, but these were advances on his total compensation which was not computed until after the end of the fiscal year. When Freeman left, his duties were turned over to Johnson. After January 25, Freeman was

under no duty to Rockwood under the employment agreement between them.

9. On January 26, Freeman wrote out a private, handwritten memorandum of the previous day's events, stating in part, "Mr. Carroll asked me if I had done any work on my ideas on company time or at company expense. I told him that I definitely had not—that I had reduced nothing to writing, drawings or practice; and that I would have to prove out some ideas by experiments. * * * I also pointed out to Mr. Carroll that I had no specific ideas and that I had to explore many avenues before I even knew what I was going to do."

10. Actually, Freeman knew very well what he was going to do. He had definitely decided before his meeting with Carroll on January 13 that he and Reck would form a corporation to manufacture double-seated ball valves from hard brass bar stock (as distinguished from individual castings) and that they would have soft lip seats of rubber, nylon, teflon or similar material. At least prior to January 25 and almost certainly before January 20, Freeman and Reck engaged Boston counsel to draft the planned company's articles of incorporation and by-laws. Freeman telephoned Reck on January 25 to tell him that he had resigned. Freeman spent the remaining days in January organizing his personal affairs and organizing Jamesbury Corporation. The organizational meeting of the new company, of which Freeman was to be president and principal shareholder, was held January 29. Reck was already holding the investors' checks post-dated to February 2.

11. On February 1, Freeman commenced putting his ideas on paper, in a series of drawings and sketches of valve seat parts, including representations of lip seat configurations substantially the same as were eventually patented.[3]

---

3. No original drawings were produced at or before the trial of the instant case or in connection with any of the patent infringement litigation mentioned herein. Only Xerox or photocopies were available and some of them were copies of redrawings

and revisions. Undoubtedly, many drawings and sketches made by Freeman during February 1954 were discarded or misplaced long before December 21, 1965. However, the court attaches no significance to their loss or destruction.

Some were undated, but none was begun before February 1. He was not an efficient draftsman and it took him several days to complete the drawings; he did not complete any one of them in a single day. While drawing and sketching during the first or second weeks of February, he commenced drafting a written description of the novelty of three ideas he was working on, one of them for the new valve seat and the others for the design of a stem square and stem pin which he had also conceived while a Rockwood employee. The written statement was completed before February 23 when he took it and five illustrative sketches to patent attorneys in Boston. Regarding the novelty of the valve seat, the statement read in part,

"The new valve seat has both a flexible sealing surface and a non-flexible surface to absorb compression load. By utilizing the design as shown, the lip seal is precompressed before the ball surface strikes the non-flexible surface. The intent of the design is to maintain a definite space between the seat and the ball to allow for swelling."

This statement described the essence of patent '666 and the accompanying sketches portrayed the critical configuration of the lip seat (thereafter modified but without altering the novel principle employed).[4]

12. The ideas which developed in Freeman's mind until embodied in patent '666 and the technical and scientific knowledge with which he mentally tested them came to him in the course of his employment by Rockwood. Freeman's knowledge of ball valves and technical and operational problems encountered with valves being manufactured by Rockwood and other companies was the result of his employment. Six months before resigning he learned from a fellow employee, Cambria, where to read up on drilling a square hole in the top of a metal ball, information pertaining to the stem square design which was one of the three ideas he regarded as novel when preparing his memorandum for patent counsel in early February 1954. He saw lip seats in a prototype double-seated valve which was fabricated and tested in 1951 by another fellow employee, Kosciusko.[5] In the course of numerous conferences with patent attorneys for Rockwood, he became sophisticated in the law of inventions and patents and was thinking of legal rights when he told Carroll at their meeting on January 25 that he "had reduced nothing to writing, drawings or practice."

13. After reducing his ideas to drawings and writings in mid-February 1954, Freeman manufactured experimental valves and testing equipment and, after much testing to determine the utility of his invention, filed the original or "parent" patent application on June 11, 1954, together with Oscar R. Vaudreuil as co-inventor.

14. Vaudreuil, since deceased, was not a joint inventor of patent '666. He was a bright mechanic, had invented a lawn sprinkler and ran a machine shop which supplied Jamesbury Corporation with screw machine parts during its early years. In April 1954, Freeman began using Vaudreuil's place in which to con-

4. A lay elaboration of the description would be that when the valve is assembled, the flexible interior edge of the sealing ring, which looks like a washer with the inner edge of the ring being thinner and hence more flexible than the outer edge, is squeezed against the valve ball, i. e., precompressed or preloaded, such that the inside edge of the ring, or "lip", bends or flexes or deflects inwardly because of the shape or configuration of the ring to an extent that it may follow or adhere to or stay in contact with the ball as the ball moves or floats within the assembly, thus maintaining a tight seal; the motion of the ball away from and back toward the lip on either side of a double-seated valve is caused by the change of direction of the flow of material in the pipe.

5. Much evidence was introduced at the trial about a sketch of a lip seal by another Rockwood employee, Pagonis; but its relevancy was not established by plaintiff. Probably the sketch was drawn after Freeman's resignation.

duct experiments. He was having difficulty with seats which would rip under testing and in early May 1954 Vaudreuil suggested that he chamfer or cut away a small part of the metal casing behind the flexible seat. Evidently it worked in eliminating or reducing tearing of the seat and also enabled the lip to move more freely. After Jamesbury's patent attorneys had prepared the draft of the patent application, Freeman visited Vaudreuil and said he wanted a co-inventor and Vaudreuil agreed. Though the chamfered space suggested by Vaudreuil is shown in one of the drawings filed with the application, it was not mentioned in the claims and was not required to make the lip operative. It had nothing to do with the critical configuration or precompression of the seat. Vaudreuil was paid for his services and supplies but was paid nothing for his purported contribution to the patent.[6] He agreed orally with Freeman that any patent issuing on the joint application would belong to Jamesbury.

15. The summer of 1954 was devoted to the manufacture of several different prototypes. In September, the first lot of valves was made and in November Jamesbury first shipped goods for billing. At that time it had 3 or 4 employees. Now it has approximately 300 employees, 3,000 stockholders and annual sales of $15,000,000. About 90% of its products are covered by patent '666. According to a report filed May 16, 1967 by the hearing commissioner of the Court of Claims, Jamesbury ball valves have been used in Navy submarines and have also solved problems in non-military applications, in the synthetic rubber field, and in the handling of dangerous gases or chlorine.

*Conclusions of Law*

■ This case turns upon the meaning of the word "invention" in the agreement (set forth in its entirety in an ap-

pendix to this memorandum) between Rockwood Company and Freeman signed shortly after he became its employee. Although the term in the contract clearly means more than a patentable invention, the contract does contain several references to patentability and a good starting point would seem to be the meaning of the word "invention" in the sense in which it is employed in the Patent Act, Title 35 of the United States Code. In that sense "invention" comprises conception and reduction to practice. The basic principles are stated in Deller's Walker on Patents (2d ed. 1964) §§ 45 and 46, as follows:

"The conception of an invention involves the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the inventive act is to convert the mental idea to reality (i. e., reduce the idea to practice). It is, therefore, the formation in the mind of the inventor of a definite idea of a complete and operative invention as it is thereafter to be reduced to practice that constitutes a complete conception within the meaning of the patent law. A complete conception is matter of fact and must be clearly established by proof. Where the evidence showed that an inventor had a conception of the desirability of doing what the invention was designed to do, but failed to show that he had an adequate conception of the means by which the result was to be accomplished, it was held that the inventor could not be regarded as having a conception of the invention in controversy." (at 191)

" * * * Invention consists of the conception not only of the inventive idea but also of the means for carrying the idea into practice and producing the desired result. Until the entire conception is complete and is ready to be incorporated in a practical

---

6. If relevant, the court would find that Vaudreuil was added to the application as a spurious joint inventor to shield Jamesbury against any claim by Rock-wood that its president and principal shareholder had conceived the invention while a Rockwood employee.

embodiment, there is no available and complete conception of the invention within the meaning of the law of patents." (at 199)

"Every invention contains two elements,—a mental element and a physical one. An idea conceived by the inventor is the mental element and the application of that idea to the production of a practical result is the physical element. In order to constitute an 'invention' in the sense in which that word is employed in the Patent Act, an inventor must have proceeded so far as to have reduced his idea to practice and to have embodied it in some distinct physical form." (at 199–200)

■ In this case Freeman virtually conceived patent '666 while employed by Rockwood as its director of research.[7] It is necessary to qualify the court's finding of fact by the adverb "virtually" because it is impossible to find on the basis of the evidence that Freeman had completely conceived the entire invention at the time he left Rockwood. He had gotten to the point where no more than an additional few days or perhaps few hours of thinking was required for him to put his ideas on paper in a form substantially the same as his later patent application. The other key finding of fact is that Freeman deliberately refrained from reducing his ideas to drawings or written description until after his resignation. Plaintiff's position is that, in his fiduciary capacity as head of the corporate research department, Freeman should have disclosed his ideas to his employer whether or not they amounted to complete conception and that he violated his agreement by not endeavoring to reduce them to writing while still a company employee. Defendant's response is that Freeman's entire duty in the matter was described in the contract and that he was entitled to suspend his inventive process and prescind from the solution of the problems which he recognized while a Rockwood employee until after resigning.

The answer to the controlling issue in this case is by no means automatic on the basis of the axiom stated in Clark Thread Co. v. Willimantic Linen Co., 1891, 140 U.S. 481, 489, 11 S.Ct. 846, 849, 35 L.Ed. 521, "A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character. These propositions have been so often reiterated as to be elementary." That decision and innumerable others, e. g., Symington Co. v. National Malleable Castings Co., 1919, 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045, dealt with priority of invention and it was the inventor's purpose in such cases to show that he had made the invention before someone else.

■ In the instant case the inventor has endeavored to prove the opposite proposition, i. e., that he did not make an invention until after a given date. However, the law of Massachusetts which governs the rights of the parties to this third party action does not make any distinction between the two situations. In cases similar to this one in which former employers were seeking to impose constructive trusts upon inventions patented by former employees, the Supreme Judicial Court has interpreted the word "invention" as requiring more than mere mental conception, i. e., a concept demonstrated to be true by practical application or embodiment in tangible form. Lamson v. Martin, 1893, 159 Mass. 557, 563, 565–566, 35 N.E. 78;

---

7. In the language of the Government's argument in United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 180–181, 53 S.Ct. 554, 77 L.Ed. 1114, "Essentially the purpose of industrial research is to apply to industry the discoveries of science. When one is employed for scientific research to meet the needs of a rapidly advancing industrial art, such as radio, his employment necessarily includes the duty to employ his talent in devising new and useful appliances for the improvement of the art. If, in this process, discovery and application to useful purposes rise to the level of invention, the invention is the fruit of the employment."

National Development Co. v. Gray, 1944, 316 Mass. 240, 249–250, 55 N.E.2d 783. Granted, both cases are distinguishable on their facts from the instant case, and the discussion in the later case is in dictum. However, the opinion in National Development Co. v. Gray in employing the traditional definition cites United States v. Dubilier Condenser Corp., *supra*, a case similar to this one in that it concerned a claim by the United States against former employees who had been engaged in research and testing in the laboratories of the Bureau of Standards. The court there also defined "invention" as requiring a physical element as well as a mental one.

Plaintiff suggests that in stating, "The idea is only the starting point, and it does not become an invention until it is developed and perfected and becomes embodied in some *tangible form* * * *" (316 Mass. at p. 249, 55 N.E.2d at p. 788 —emphasis added) and that " * * * the idea had crystallized into such *definite form* between the time Lawson left the plaintiff's employ that he and those with whom he spoke concerning the new machine knew in a general way the principles governing its operation and its probable practical value" (at p. 250, 55 N.E.2d at p. 788—emphasis added), the court in National Development Co. v. Gray, *supra*, meant a refinement of the mental conception such that it related to a definite form, in this case the special configuration of the lip seat which, together with its preloading, was the essence of Freeman's invention and patent. In the court's opinion this interpretation of the Supreme Judicial Court's language is simply not warranted by the context. And the same may be said about the meaning of the term "tangible form" as it appears at p. 188 of the opinion of the Supreme Court in United States v. Dubilier Condenser Corp., *supra*.

■ In ascertaining the parties' intention in using the word "invention" in the agreement between Rockwood and Freeman, the contract as a whole is, of course, important. As in Lamson v. Martin, *supra*, the term was used in connection with "patent applications" and there is nothing in the agreement to indicate that the parties used it in a different sense from that which would constitute an invention under the patent law. The *Lamson* case, 159 Mass. at p. 563, 35 N.E. 78, is also helpful in identifying an exception to the requirement for invention of presentation in some physical form or description, namely, when an invention consists in the discovery of a new application of a natural force like that, for instance, of the telegraph or the telephone or the making of iron rolls. Obviously that exception does not cover patent '666.

A different result in this case might be reached if broader language had been employed in the contract, whose words are to be contrasted with those involved in New Jersey Zinc Co. v. Singmaster, 2 Cir., 1934, 71 F.2d 277, 278, where the employment contract covered "all patentable *ideas* and devices originating with, or developed by, an employee" (emphasis added) and in Winston Research Corp. v. Minn. M. & Mfg. Co., 9 Cir., 1965, 350 F.2d 134, 145, where the contract required employees to assign "inventions *conceived* during employment" (emphasis added). The contract between the parties in this case most closely resembles that in Goodyear Tire & Rubber Co. of Akron, Ohio v. Miller, 9 Cir., 1927, 22 F.2d 353, in which the court stated, at 355, "If, therefore when he first thought of inventing a device, he preferred to withdraw from the obligation of the contract and work on the invention independently, and at his own expense and risk, that course was open to him."

■ Plaintiff has urged that the agreement was understood by the parties to require Freeman to disclose ideas which might lead to inventions as well as inventions themselves and points to his practice of discussing such ideas with other employees and with the company's patent counsel. An important aid in the interpretation of contracts is of course the practical construction placed

on the agreement by the parties themselves. 4 Williston on Contracts (3d ed. 1961) § 623. However, this is a secondary rule of interpretation which will yield to the plain meaning of the contract. The definition of "invention", as appears from the cases cited above, is too well settled and specific to permit resort to the secondary rule in this case,[8] especially since Freeman's practice appears to have been part of his routine responsibilities as director of research.

■ Freeman's practice of discussing his inventive ideas with the company's patent attorneys, and the consequent assignment to Rockwood of approximately 19 patents which issued in his name, did not in our opinion enlarge his legal obligations beyond those stated with particularity in the contract of employment. See American Circular Loom Co. v. Wilson, 1908, 198 Mass. 182, 84 N.E. 133, wherein it was said, at 201:

> "The invention and the patent thereon belong to the inventor, to whom the patent has been issued, unless he has made either an assignment of his right or a valid and enforceable agreement for such an assignment, even though it was his duty to use his skill and inventive ability to further the interests of his employer by devising improvements generally in the appliances and machinery used in the employer's business. This was assumed in Burton v. Burton Stock Car Co., 171 Mass. 437, 50 N.E. 1029, and in Hopedale Mach. Co. v. Entwistle, 133 Mass. 443. It is the settled doctrine of the federal courts."

With respect to express agreements that the invention should become the property of the employer, it was also said in the same opinion, at 202, 84 N.E. at 136, "but even such agreements have been construed somewhat strictly against the employer."

Plaintiff has argued that the interpretation which the court has accepted is inequitable and permits employees, especially those in fiduciary capacities, to frustrate the intent of the agreement by delaying inventions until after severance from their employment. It is true that in this case there are circumstances indicating a lack of good faith on the part of Freeman such as his making unreasonable demands which would give him an excuse to resign and his adding Vaudreuil to the patent application as a joint inventor without sufficient reason. On the other hand, an inventor who defers embodiment of his novel ideas runs the risk that another will be the first to make the same invention. In the instant case there were other bright engineers at Rockwood, such as Kosciusko, who had the same information at their fingertips as did Freeman; and they might well have conceived the same novel ideas while Freeman was holding off putting his ideas on paper. Moreover it was by no means certain when Freeman started his own company that his invention would be successful either commercially or in terms of issuance of a patent. There was many a slip 'twixt the lip and the seal. Experimentation and testing by Freeman might have disclosed that his invention was unworkable and unpatentable. A literal construction of the contract in this case, which the court believes to be required by the law of Massachusetts, seems consistent with the broad public policy of encouraging inventors to take financial risks for the betterment of society.

The court concludes, therefore, that Freeman did not make an invention while employed by Rockwood and did not breach his contract with the company or violate any general fiduciary duty to the company arising from his position as director of research. Accordingly, it is

8. In this respect it would be significant if Rockwood's president, Carroll, at his meeting with Freeman on January 25, 1954 asked Freeman the following question recorded in Freeman's memorandum of their meeting, "Mr. Carroll asked me if I had done any work on my ideas on company time or at company expense" thereby indicating that Carroll also felt that the contract applied only to ideas which had been worked upon. The court, however, has not found that Carroll asked the question but only that Freeman wrote the memorandum.

ordered that judgment be entered for the third party defendant, Jamesbury Corporation, on the intervener E. W. Bliss Company's third party complaint and that the third party complaint be dismissed.

## APPENDIX

AGREEMENT made this 28th day of August, 1940, by and between Rockwood Sprinkler Company of Massachusetts, a Massachusetts Corporation having a place of business in Worcester, Commonwealth of Massachusetts, hereinafter designated as Rockwood, and H. G. Freeman of Worcester, in the State of Massachusetts, hereinafter designated as Freeman

## WITNESSETH:

WHEREAS Rockwood is engaged throughout the United States of America and elsewhere in the business of manufacturing and dealing in the production of fire protection equipment, pipe unions, pressed metal fabrications and other devices and functions covered by its charter.

WHEREAS said Freeman is desirous of entering into the employ of Rockwood in the pursuit of its corporate purposes,

NOW, THEREFORE, in consideration of such employment and the payment of wages to Freeman by Rockwood, said Freeman hereby agrees with Rockwood to enter its employ and give his best services, and without further consideration to give to Rockwood the full benefit and enjoyment of any and all inventions or improvements which he may make while in the employ of Rockwood relating to methods, apparatus, chemical substances, or methods of producing which are being used, manufactured or developed by Rockwood, or the use, manufacture and development of which was at the time of said invention or inventions in contemplation by Rockwood, and all inventions which are made or worked out on the time and at the expense of Rockwood. The said Freeman further agrees for the consideration aforesaid to execute all papers which may be considered necessary or proper in the opinion of counsel for Rockwood to protect or properly file patent applications in the United States and/or foreign countries on all inventions or improvements made by the said Freeman during the course of his employment by Rockwood, and to assign the entire interest in such invention to Rockwood.

Said Freeman further agrees that he will without additional consideration disclose promptly to Rockwood all of the above-described inventions or improvements which he may make while in the employ of Rockwood, and if said Rockwood should not desire to patent any of said inventions or improvements but keep the same secret, Freeman will do all in his power to assist it in this and will not disclose any information as to the same or any of them except at the request of Rockwood.

Inasmuch as through his relationship with Rockwood the said Freeman may from time to time in the course of his employment become possessed of secret or confidential information concerning the business and affairs of said Rockwood to a greater or less extent, the said Freeman hereby covenants and agrees to and with the said Rockwood that all information concerning the business and affairs of said Rockwood of which he shall at any time become possessed and which is of a confidential or private nature, he shall carefully guard and keep; that he will at no time either while he is in the employ of said Rockwood or after such employment shall have ceased, disclose any such information to any person, firm or corporation, or employ the same in any wise other than for the benefit of said Rockwood in connection with said employment.

IN WITNESS WHEREOF the said parties have executed these presents the day and year first above written.

ROCKWOOD SPRINKLER COMPANY OF MASSACHUSETTS

By s/ W. J. Carroll

President

s/ H. G. Freeman