## Swanson-Erie Corporation v. Assembly Machines, Inc.

*Irving Murphy*, for plaintiff.
*Harry Martin*, for defendants.

McCLELLAND, *J.*, October 29, 1980—This case arises from a complaint in equity which seeks to compel defendants to assign certain patents to plaintiff and to enjoin defendants from transferring, licensing or encumbering the patents in any way. Many allied pleadings, narrative statements, briefs, et cetera have been filed and the case proceeded to a trial before Judge Lindley R. McClelland.

Pursuant to Pa.R.C.P. 1517, the "statement of issues" will be revealed in the course of the discussion of questions of law. Also, pursuant to Pa.R.C.P. 1517, the essential facts will be stated in "narrative form."

## FACTS AND DISCUSSION OF QUESTIONS OF LAW

Essentially, Donald S. Stevens is the vice president of Assembly Machines, Inc. (hereinafter AMI). For several years, Stevens was employed by Swanson-Erie Corporation (hereinafter S-E) as an administrative engineer.

On October 17, 1966 Stevens signed an employment agreement with S-E, a copy of which is attached hereto [Appendix A] and incorporated herein by reference.

S-E charges Stevens breached the agreement because he conceived an invention while employed by S-E and S-E seeks assignment of three patents to them. S-E is a business involved in the manufacture and sale of certain assembly machines.

In 1972 Charles K. Watters, formerly S-E's sales manager and presently president of AMI, approached S-E with the idea of forming a subsidiary of S-E to manufacture a more standardized version of the assembly machine, thus keeping to a minimum the number of parts that had to be tailor-made. Later, Watters resubmitted his idea to S-E President Swanson, but apparently he received no encouragement. Only then did Watters commence plans to finance his own business in an attempt to follow through on his proposal.

Early in 1973 Watters began discussing his idea for a standard assembly machine with defendant Stevens. Stevens agreed that the project was viable, and by October, 1973 Stevens and Watters had received commitments for the required capital. Watters then informed Swanson of his and Stevens' plan to leave S-E to form their own corporation.

Swanson was fully aware of the proposed purpose of the Watters-Stevens company to manufacture and sell standardized assembly machines, but there is no evidence to suggest that he objected to the possible competition. Later S-E even referred customers to AMI.

At Swanson's request, Watters and Stevens agreed to postpone their departure from S-E until the end of November, 1973. An operative prototype of an AMI machine made its debut in May, 1974 and was displayed to S-E personnel.

In the fall of 1977 S-E charged AMI with patent infringement. During the discovery phase of the infringement claim, S-E believed it had uncovered evidence that Stevens had "conceived" the invention resulting in the successful design of the AMI machine while employed at S-E and that under the terms of the 1966 contract, S-E was entitled to the assignment of the patents procured in 1976.

It is undisputed that the subject matter of the contract is "inventions made or conceived" by Stevens while employed at S-E. Thus, the issue is whether Stevens made or conceived an invention, or inventions, prior to November 30, 1973.

What is an invention?

The United States Supreme Court in United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114 (1933), characterized an invention as "the birth of an idea *and its reduction to practice. . . .*" (Emphasis supplied.)

In an earlier case, the Supreme Court held:

"A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character." T. H. Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 386, 39 S.Ct. 542, 63 L.Ed. 1045 (1919).

Unfortunately, Pennsylvania courts have not had occasion to establish a controlling definition of the word "invention." An examination of the cases from other states, however, shows them to be in general accord with the Supreme Court cases cited above.

For instance, in Rex Chainbelt, Inc. v. Borg-Warner Corp., 477 F. 2d 481, 487 (7th Cir. 1973), it was stated: "It requires no citation of authority to state that invention has not occurred until the subject of the invention has been both conceived and reduced to practice."

The cases previously cited support our view that an invention conceived is both the original idea plus the perfected mechanical means by which that idea is to be realized.

Stevens' assembly machine was not properly operative—not reduced to practice for several months after he left S-E's employment. Obviously, the assembly machine was not an invention "made" during Stevens' work for S-E.

I do not wish to appear Reagan-like in my simplicity but the acres of paper work and testimony come down to the main issue of whether or not Stevens' invention was "conceived" during his work on any project of S-E or was "conceived" by Stevens relating to or resulting from his work for S-E. As stated in 60 Am. Jur. 2d, Patents § 16:

"[The] conception of an inventive process involves proof of mental possession of the steps of an operative process and, if necessary, . . . the means to carry it out to such a degree that nothing remains but routine skill for the effectuation thereof. . . .

"Conception is shown if it is proved that (1) the inventor possessed a definite . . . permanent idea of the complete and operative invention or (2) the inventor made his invention sufficiently plain to enable one of ordinary skill in the art to understand it. If drawings are relied on as evidence of the conception of the invention they must show a complete conception, free from ambiguity and doubt, and such as would enable the inventor or one skilled in the art to reduce the conception to practice without any further exercise of inventive skill."

Conception is the formation in the mind of the inventor of a definite and complete idea of the operative invention. (Date of Invention: The Varying Standards of Proof, 57 Georgetown L.J. 162 (1968).)

To be a complete conception there must be a formation in the mind of the inventor of a definite idea

of a complete and operative invention as it is to be reduced to practice. Until the conception is complete and ready to be incorporated in a practical embodiment, there is no complete conception of an invention: Jamesbury Corporation v. Worcester Valve Co., Inc., 318 F. Supp. 1 (D. Mass. 1970). I find no repudiation of the thesis in Jamesbury Corporation v. Worcester Valve Co., Inc., 443 F. 2d 205 (1st Cir. 1971).

Throughout the trial, it was obvious that Stevens had an assembly machine in mind but did not know how to activate it properly. The definitions of conception I have quoted appeal to me as being correct either as plaintiff's "arcane" patent law definitions, but also as the meaning of conception given to that language by "common usage" and "usage in the trade." 3 Corbin on Contracts §538.

Therefore, an operative standard assembly machine was not developed by Stevens until six months after terminating his employment with S-E. Since I have concluded that an invention is an idea which has been reduced to practice, at least on paper, I must hold that Stevens had not made or conceived of an invention until he also knew of the process by which his idea could operate and this occurred subsequent to his employment with S-E and only after some further experimentation.

When Stevens left S-E he had an idea, a goal, which he attempted to illustrate in a drawing. The assembly machine built according to specifications of that drawing did not operate properly. The conception was abortive.

Mention must be made of the strange case of Morgan Adhesives v. Questel, 162 U.S.P.Q. 61 (Ohio Court of Common Pleas 1969). The case is strange because it occupies one page of space and is

devoid of citations. Conception to Judge Mitchell in Morgan appears to be an "original idea." Conception, as defined heretofore, is far more than that.[1]

In Mosser Industries v. Hagar, 200 U.S.P.Q. 608 (C. P. Lehigh County, 1978), the burden of proof in a case such as this one was defined as:

"In an equitable action to compel the assignment of an invention of an employee to the employer, the employer must show by clear and convincing proof that (1) the invention was conceived by the employee while in the employ of the employer. Mississippi Glass Co. v. Franzin, 138 F. 924 (W.D. Pa. 1905), rev'd on other grounds. 143 F. 501, 1906; (2) the assignment was governed by a valid, binding, and enforceable contract, unambiguous in its terms so as to warrant specific performance. Weaver v. Shenk, 154 Pa. 206, 26 A. 811, 1893; Triumph Electric Co. v. Thullen, 235 F. 74 (3rd Cir. 1916); Pressed Steel Car Co. v. Hansen, 137 F. 403 (3rd Cir. 1905). See Restatement of Contracts Section 370, 1933; and (3) all conditions and covenants concerning the assignment agreement were fulfilled. The policy of the law is to protect the rights of the inventor, and in furtherance of that policy the language of an assignment agreement must be clear and precise, displaying the unmistakable intention that the matters involved are within the contemplation of the parties. White Heat Products Co. v. Thomas, 266 Pa. 551, 109 A 685, 1920."

---

1. A fascinating article in 57 Mass.L.Q. 27 (1972) entitled The Law of the Employed Inventor—Time for a Change?, by patent attorneys George M. Doherty and Joseph S. Iandiorio doubts that "the court of appeals would accept either—the evidentiary or equity approaches" of Morgan Adhesives v. Questel. The authors cite Jamesbury to the contrary.

In view of this decision, I have not discussed the affirmative defenses of estoppel, et cetera.[2]

## CONCLUSIONS OF LAW

(1) Defendant Stevens did not make or conceive the inventions of the Stevens patents in question while he was employed at Swanson-Erie Corporation.

(2) Defendant Stevens did not break his agreement with Swanson-Erie Corporation, dated October 17, 1966.

## DECREE NISI

And now, October 29, 1980, upon consideration of the foregoing case, it is ordered, adjudged and decreed that:

(1) the complaint is dismissed and the relief prayed for denied. Judgment is ordered for defendants.

(2) plaintiff will pay the costs of this proceeding.

## Appendix A

## AGREEMENT

## SWANSON-ERIE CORPORATION

In consideration of One ($1.00) Dollar, receipt of which is hereby acknowledged, and intending to be legally bound hereby, and in further consideration of my employment by the Swanson-Erie Corpora-

2. For example, as to estoppel (Paragraph 31 of defendant's new matter), several cases hold that an employer's rejection of an employe's proposed invention constitutes estoppel to obtain the subsequent patents pursuant to a written assignment agreement: Phillips Screw v. Givnan, 200 Ore. 279, 265 P. 2d 1084 (1954); Garbell v. Consolidated Vultee, 94 F. Supp. 843 (S.D. Cal. 1950).

Again, because of this decision, I do not reach the estoppel issue.

tion (hereinafter referred to as "the company") a Pennsylvania Corporation, having its principal place of business at Erie, Pennsylvania, I do hereby agree that I will promptly communicate to the company all inventions made or conceived by me during my work on any project of the company, and on inventions made or conceived by me, relating to, or resulting from my said work.

I further agree to assist the company in every proper way to secure its rights with respect to such inventions and will execute all proper papers for use in applying for, and obtaining, such United States and/or foreign patents, and will assign the same to the company.

I further agree that I will testify in any legal proceedings necessary to obtain any such patents and any suits for infringement thereon.

I further agree that I will not divulge to any person or persons, other than specified agents or employees of the company, any information whatsoever relating to inventions covered by the terms of this agreement.