171 N.J. Super. 203 (1979)
408 A.2d 455
JOSEPH R. ANDREAGGI ET AL., PLAINTIFFS,
v.
MATTHEW J. RELIS, DEFENDANT.
Superior Court of New Jersey, Chancery Division, Essex County.
Decided March 13, 1979.
*205 Mr. Thomas L. Adams for plaintiffs.
Mr. Howard M. Kaplan and Mr. S.C. Yuter of the New York Bar for defendant.
*206 DWYER, J.S.C.
Plaintiffs commenced this action to compel defendant Matthew J. Relis to assign his interests in certain patents. Relis asserts, among a myriad of defenses, that as a coinventor he has rights in alleged further developments reflected in the patent application and patents which were made solely by plaintiffs after Relis and plaintiffs were discharged by a common employer and plaintiffs acquired the employer's rights to the inventions. Since the alleged further developments were made after termination of employment and solely by plaintiffs, Relis alleges that he is under no duty to assign his interests in those alleged further developments because he has those rights individually and common employer never had any rights in them. Neither counsel nor the court has found any decision on the question. Plaintiffs deny that they made any further developments after the assignment and the sale of the equipment embodying the inventions to plaintiffs by Curtiss-Wright, the common employer; hence they assert that they have a right obtained from Curtiss-Wright to have Relis assign his interests in the patents which have issued.
While all three were employed by Curtiss-Wright the company undertook to develop a device that would simultaneously generate a document that could be read by the human eye and a machine. The initial focus was to develop a way-bill that could accompany goods in transit. The personnel handling the goods could read the document. For control and accounting purposes, a machine could read the document electronically and generate additional copies.
The concept to accomplish this result was to utilize a typewriter which was linked to an encoding device. The stock for the document was to be paper which had a magnetic backing. The operator would type the document on the front. Simultaneously the keys of the typewriter would trigger the encoding device that would record the same information on the magnetic field on the reverse side, as well as a code of instructions to the machine that was to read the document. The recording device was a *207 head containing windings of wire which generated an electric field. To correct for errors, provision was made to erase the bits encoded on the magnetic coating without destroying or distorting the other bits so encoded, and inserting new bits when the new typed character was inserted to replace the erased visible typed character. The machine or device embodying the concept was constructed at Curtiss-Wright. For reasons hereinafter discussed, Curtiss-Wright terminated the project and transferred its rights to Joseph Andreaggi. In return for monies advanced by Robert J. Graf, Andreaggi assigned part of his rights to Graf.
Andreaggi, Graf and Relis signed application Serial No. 250,872 for letters patent for a visual and magnetic recording system in April 1972 as coinventors. It was filed on May 15, 1972 with the United States Patent and Trademark Office. At the time that plaintiffs requested Relis to sign the application their attorney also advised Relis that they would subsequently request an assignment of his interests in the patent. During 1973 certain amendments were made to the application and four divisional patents were issued on December 28, 1973. On July 9, 1974 Patent No. 3,823,405 issued on the basic application.
During 1973 and up to July 9, 1974, plaintiffs and their attorney requested Relis to assign his rights to plaintiffs.
On May 23, 1975 plaintiffs' attorney tendered a written assignment of Relis' rights in the patent to Relis for signature. This has not been executed.
The court notes that similar problems exist with the divisional patents. The court concludes that resolution of the questions concerning the basic patent will govern the issues on the other patents.
In this action plaintiffs, in addition to seeking an order compelling Relis to assign his rights, seek money damages sustained by his refusal to cooperate in connection with certain foreign patents, and money damages suffered because of his persistent refusal to assign the rights under the patents involved *208 in this litigation with the consequence of substantial cost of this litigation and inability to market or sell licenses under the patent. Plaintiffs further seek to restrain Relis from disclosing the nonpublic portions of the contents of the invention disclosures obtained by plaintiffs from Curtiss-Wright. They base their action on the rights acquired from Curtiss-Wright and protection of their proprietary rights in such material.
In addition to the defense based upon the alleged further developments, Relis asserts that he is under no duty to convey any rights because: (i) he was not employed to invent, (ii) Curtiss-Wright fired him before it asked him for an assignment and (iii) Curtiss-Wright could not assign any rights under a contract for personal services. He also asserts that the action is barred by the statute of limitations and by laches.
The court will consider the following matters in the order stated.
1. What was the relationship between Relis and Curtiss-Wright?
2. What had been accomplished on the project at Curtiss-Wright?
3. What was the effect of the contract of employment, Relis' separate assignments to Curtiss-Wright and Curtiss-Wright's assignment to plaintiffs?
4. What duties, if any, did Relis owe to plaintiffs and Curtiss-Wright thereafter?
5. Is the action barred by limitations or laches?
6. Relief.
The court will set forth its findings of facts under the separate headings rather than state them separately.

1.
Relis has a B.S. degree in electrical engineering from C.C.N.Y. and a M.S. degree in electrical communications from M.I.T. He worked at the U.S. Navy's Naval Ordinance Laboratory and at another major electronics corporation as an assistant development engineer. At the suggestion of a friend, he applied to Curtiss-Wright to be hired as the assistant manager of the Digital Computer Department.
*209 He testified that he read and understood D-2, Agreement For Services, before he signed it on December 15, 1958. On January 21, 1959 he signed another copy of the form of agreement for the purpose of adding additional patents which he had obtained prior to starting work at Curtiss-Wright. He claimed a total of seven prior patents on these two forms.
He stated that his duties as assistant manager were to perform assignments given him by the manager of the department, supervise engineers, investigate problem areas and suggest solutions, and do design work where additional work was needed.
On December 16, 1959 he was promoted to Manager, Digital Computer Department.
D-2 is a standard form of agreement. At the top of the form appears the following:
CURTISS-WRIGHT CORPORATION ELECTRONICS DIVISION AGREEMENT FOR SERVICES
IN CONSIDERATION of my employment by the CURTISS-WRIGHT CORPORATION, ELECTRONICS DIVISION (hereinafter termed the "Corporation"), upon the terms and conditions of this agreement, I, Matthew Relis of Bayside, N.Y. agree with the Corporation as follows:
........
2. Without charge, to communicate promptly to the Corporation and, upon request, to assign to it all of my right, title and interest in and to any and all inventions which I may make, or with respect to which I may be a joint inventor, while in the employ of the Corporation, which relate to or are useful or may be useful in connection with business of the character carried on or contemplated by Curtiss-Wright Corporation, its subsidiaries or affiliates and all my right, title and interest in and to any and all domestic and foreign applications for patents covering said inventions, any and all patents granted for said inventions and any and all reissues and extensions of the said patents; and to do any and all acts and to execute and deliver such instruments as may be deemed by the Corporation necessary or proper to vest all of my right, title and interest in and to said inventions, applications and patents in the Corporation and to effect the obtaining of said patents, *210 reissues and/or extensions thereof. All necessary and proper expenses in connection with the foregoing shall be borne by the Corporation.
........
3. (e) I will regard and preserve as confidential all information pertaining to the Corporation's business that may be obtained by me from specifications, drawings, blueprints, reproductions and other source of any sort as a result of such employment and I will not without written authority from the Corporation so to do, disclose to others during my employment or thereafter, such or any other confidential information obtained by me while in the employ of the Corporation.
In 1961, as a result of discussions with Pennsylvania Railroad personnel, Curtiss-Wright undertook development work to see if it could devise a system to simultaneously generate a document that could be read by the human eye and by a machine and that would be sturdy enough to be handled by railroad personnel. Relis, Graf and Andreaggi were assigned to the project. It was called Magdop. Financing for the project was terminated in September 1963, but work continued until 1964 because of the enthusiasm of the three for the project.
The 16 invention disclosures filed with the Patent Department at Curtiss-Wright show that Relis participated actively in the inventive process. He explained his personal possession of the original of certain of the invention disclosures, without permission, on the grounds that he had a right to know what he had invented. He also retained certain engineering notebooks with notes concerning the work on Magdop, without authority. An attorney from Curtiss-Wright identified the documents at trial as having been corporate property which should have been delivered to plaintiffs.
The evidence establishes that all three were full-time employees. Curtiss-Wright spent over $200,000 on the project under budget controls. From the testimony of the witnesses the court finds that more was spent because the parties picked up tools and parts from other departments which had little use for them *211 or which other departments wanted to be helpful to the project. These donations were the property of Curtiss-Wright.
The evidence does not establish that during the period that Magdop was pursued Relis ever worked on the project, its ideas, or the equipment embodying the ideas, except as a full-time employee of Curtiss-Wright.
Unlike the fact patterns in International Pulverizing Corp. v. Kidwell, 7 N.J. Super. 345 (Ch.Div. 1950); Marcalus Mfg. Co. v. Sullivan, 142 N.J. Eq. 434 (Ch. 1948); Connelly Mfg. Co. v. Wattles, 49 N.J. Eq. 92 (Ch. 1891), the terms of the employment are not oral but written. At the time of hiring, Relis claimed seven patents to his credit. The area in which he was to work was developmental and experimental.
The court finds that Relis was not hired to be the superintendent of the works, as the court found on the disputed record before it in Connelly Mfg. Co., supra, but was hired to do some administrative work and to help out in the inventive process. The court does not find Relis credible that he did not do inventive work or was not expected to do it. It is inconsistent with the memoranda and invention disclosures which he wrote in many cases and signed either individually or with one or both of the plaintiffs. It is also inconsistent with his taking original copies of some of the invention disclosures so that he would know what he invented. If he believed that he had no duty to turn over inventions made at Curtiss-Wright, why did he file invention disclosures for four years on the Magdop project instead of taking all of them home?
As stated in International Pulverizing Corp., supra, by Judge Jayne:
Where a person expressly or impliedly contracts to devote his mental faculties and exercise his inventive ability for the benefit of his employer, the inventions conceived by him in the course of his employment and as a consequence of its pursuit belong in equity to the employer. [7 N.J. Super. at 347]
*212 The present New Jersey Supreme Court approved this view in Misani v. Ortho Pharmaceutical Corp., 44 N.J. 552, appeal dism., 382 U.S. 203, 86 S.Ct. 398, 15 L.Ed.2d 270 (1965).
Counsel for Relis urges that the agreement was never effective because no person signed it on behalf of Curtiss-Wright. The form contains no provision for such a signature. Curtiss-Wright is identified in the form. It employed Relis for seven years. The court finds that Curtiss-Wright accepted and performed under the contract. Relis has not argued that the statute of frauds requires a signature. In Marcalus Mfg. Co. and International Pulverizing Corp., both supra, the courts granted injunctive relief compelling assignments of patents under oral contracts; hence, if Relis was hired under an oral contract, the court could grant relief.
Relis urges that the terms must be construed against plaintiffs because their assignor drew the form of agreement and because it is one of adhesion. He argues that certain phrases, "upon request" and "while in the employ" in paragraph 2, supra, must be read to mean that any request for assignment had to come while he was in the employ of Curtiss-Wright.
The construction of the terms of a written instrument which are not in dispute is a question of law. There is no dispute as to the terms. The court concludes that the term "while in the employ of the Corporation" defines the inventions which are intended to be conveyed and does not limit the time period in which an assignment must be requested or forever lost.
Victor D. Behn, who has been a corporate patent attorney for Curtiss-Wright for 15 years and a patent attorney since 1942, testified that normally at the time a patent application is filed an assignment of the patent rights is also filed. The face of the application will then show the name of the assignee.
He further testified that it is not unusual not to file an assignment of a patent until the patent is issued, in an attempt *213 to conceal the interest of a corporate employer in an invention from its competitors.
He also testified that there is no procedure to check all invention disclosures and obtain an assignment of an employee's interest in them before he or she is terminated. He has requested assignment of patent rights after employees have left the employer's employment.
The court concludes that a construction of the contract language that the employer had to request an assignment of a coinventor's right to patents before the employee left its employ would be impractical. A review of the cases as well as the testimony in this case show that there is mobility between employers by those working on inventions. On the facts in this case, which include other litigation between Andreaggi and Curtiss-Wright and the work of the patent attorneys to perfect the patent application, six years elapsed between the assignment from Curtiss-Wright and the filing of the application. In other situations other employees might have to do further work before the concept was sufficiently developed that a patent application could be filed. The court concludes that the request under paragraph 2 did not have to be made during the period of employment.
The court finds that the work on the Magdop was related to the business of Curtiss-Wright or contemplated by it. The project on Magdop was to develop a new product to be sold by Curtiss-Wright or a subsidiary. The court concludes that such work is the ordinary work of a business engaged in research and development for new products and is covered by paragraph 2.
Finally, Relis urges that the words "any and all inventions which I may make ... while in the employ of the Corporation" have to be interpreted to mean that the invention has to be complete, perfected and reduced to practice in the form of a working model before he is under a duty to make any assignment.
No useful purpose will be served by citing all the cases and statutory provisions of the patent law relied upon by counsel for *214 defendant in support of this argument. Many of these deal with different problems pertaining to priority.
The purpose of this contract was to settle a problem between an employer and an employee and not to settle claims of priority between inventors.
In United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488 (1933), the Supreme Court, in delimiting the shop right rule and an employee's right to patents made while working for another, described the act of invention as follows:
The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention, which consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form. [Citations omitted]
Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. The distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent. Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non exclusive right to practice the invention. [Citations omitted]. This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the *215 employer from the accruing benefits. [Id. at 188-89, 53 S.Ct. at 557-58, 77 L.Ed. at 1119, emphasis supplied]
In Kinkade v. New York Shipbuilding Corp., 21 N.J. 362 (1956), our Supreme Court applied that holding to determine that an employee of defendant who conceived a new means of installing bunks on a troop transport had no cause of action against the employer which utilized the means without additional compensation to the employee.
The United States Supreme Court, in sustaining the validity of the patents granted to Alexander Graham Bell in the Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863 (1887) said:
[I]t is insisted that the claim cannot be sustained, because when the patent was issued, Bell had not in fact completed his discovery. While it is conceded that he was acting on the right principle and had adopted the true theory, it is claimed that the discovery lacked that practical development which was necessary to make it patentable.
........
It is quite true that when Bell applied for his patent he had never actually transmitted telegraphically spoken words so that they could be distinctly heard and understood at the receiving end of his line, but in his specification he did describe accurately and with admirable clearness his process,  that is to say, the exact electrical condition that must be created to accomplish his purpose,  and he also described, with sufficient precision to enable one of ordinary skill in such matters to make it, a form of apparatus which, if used in the way pointed out, would produce the required effect, receive the words, and carry them to and deliver them at the appointed place. The particular instrument which he had and which he used in his experiments did not, under the circumstances in which it was tried, reproduce the words spoken, so that they could be clearly understood, but the proof is abundant and of the most convincing character, that other instruments, carefully constructed and made exactly in accordance with the specification, without any additions whatever, have operated and will operate successfully. A good mechanic of proper skill in matters of the kind can take the patent and, by following the specification strictly, can, without more, construct an apparatus which, when used in the way pointed out, will do all that it is claimed the method or process will do ...
The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection. It is enough if he describes his method with sufficient clearness and *216 precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation. This Bell did.... [Id. at 535-36, 8 S.Ct. at 782-783, 31 L.Ed. at 989-90]
Relis urges that under the decision in Jamesbury Corp. v. Worcester Valve Co., 318 F. Supp. 1 (D.Mass. 1970), aff'd, 443 F.2d 205 (1 Cir.1971), the words he emphasizes, particularly "make," must be interpreted to mean that the invention must be perfected or at least reduced to workable form before he is under any duty to assign his rights to the patent, because it is only at that point Curtiss-Wright acquired any rights.
Jamesbury Corp., as the assignee of Howard Freeman and an alleged coinventor of a patent issued on July 19, 1960 for a double-seated ball valve based on a patent application filed after May 1954, sued Worcester Valve Co. for infringement. E.W. Bliss Co. intervened, claiming ownership of the subject patent on the grounds that Freeman had worked for a predecessor company designing valves under a written contract of employment and had invented the double-seated valve while so employed; hence, Bliss was equitably entitled to the patent. The court found that the alleged coinventor was not an inventor.
The trial court found that Freeman had worked for the predecessor from 1940 to January 25, 1954 as head of research and development. He had obtained 19 patents and assigned them to the predecessor. It further found that the predecessor was interested in the double-seated valve. It also found that Freeman had mentally conceived the idea which was the basis for the patent while employed by the predecessor, but made no drawing, sketch or model thereof.
In the fall of 1953 Freeman conceived the idea of forming his own company to develop, manufacture and sell the double-seated valve. He discussed the matter with friends, who went out to raise funds for the venture.
*217 The District Court summarized the contract as follows:
... Freeman agreed "to give to Rockwood the full benefit and enjoyment of any and all inventions or improvements which he may make while in the employ of Rockwood * * * and all inventions which are made or worked out on the time and at the expense of Rockwood. * * * Said Freeman further agrees that he will without additional consideration disclose promptly to Rockwood all of the above-described inventions or improvements." [318 F. Supp. at 3]
In the latter part of January 1954 Freeman, by design, precipitated his voluntary departure from Rockwood. He immediately got the new corporation underway but refrained from drawing any sketches or writing a statement of how the valve worked until February 1, 1954.
On February 1, 1954 he began the sketches. On February 23 he gave a written statement to his patent attorneys of how the new valve worked. It was the basis for the patent application.
... In cases similar to this one in which former employers were seeking to impose constructive trusts upon inventions patented by former employees, the Supreme Judicial Court has interpreted the word "invention" as requiring more than mere mental conception, i.e., a concept demonstrated to be true by practical application or embodiment in tangible form. Lamson v. Martin, 1893, 159 Mass. 557, 563, 565-566, 35 N.E. 78; National Development Co. v. Gray, 1944, 316 Mass. 240, 249-250, 55 N.E.2d 783. Granted, both cases are distinguishable on their facts from the instant case, and the discussion in the later case is in dictum. However, the opinion in National Development Co. v. Gray in employing the traditional definition cites United States v. Dubilier Condenser Corp., supra, a case similar to this one in that it concerned a claim by the United States against former employees who had been engaged in research and testing in the laboratories of the Bureau of Standards. The court there also defined "invention" as requiring a physical element as well as a mental one.
........
A different result in this case might be reached if broader language had been employed in the contract, whose words are to be contrasted with those involved in New Jersey Zinc Co. v. Singmaster, 2 Cir., 1934, 71 F.2d 277, 278, where the employment contract covered "all patentable ideas and devices originating with, *218 or developed by, an employee" (emphasis added) and in Winston Research Corp. v. Minn. M. & Mfg. Co., 9 Cir., 1965, 350 F.2d 134, 145, where the contract required employees to assign "inventions conceived during employment" (emphasis added). The contract between the parties in this case most closely resembles that in Goodyear Tire & Rubber Co. of Akron, Ohio v. Miller, 9 Cir., 1927, 22 F.2d 353, in which the court stated, at 355, "If, therefore when he first thought of inventing a device, he preferred to withdraw from the obligation of the contract and work on the invention independently, and at his own expense and risk, that course was open to him." [318 F. Supp. at 7, 8]
In affirming the decision below the First Circuit said:
There is, in Massachusetts case law, definition of "invention" which coincides with the usage of the word in patent law. We cannot distinguish the relevant facts of Lamson v. Martin, 159 Mass. 557, 35 N.E. 78 (1893), from this case. Lamson also concerned an invention, made by the key man in a corporation, who was claiming a later date for his invention than that claimed by the other party. The issue was whether an invention had been made by the defendant before or after the company for which he worked, and to whom he had assigned his inventions, had sold its rights to all inventions to the plaintiff. The trial court found that the defendant had conceived of the idea before the sale but had not made a model or drawing until after the sale. It also found that a mechanic would have been competent to convert the pre-sale idea into practice. The Massachusetts Supreme Judicial Court held that an idea did not become an invention until it was put into practice or embodied in some tangible form. Its theory was that before an idea became workable reality, "there often lie severe and long-continued labor and repeated failures, and that success is not always achieved by the one who first strikes out the idea." 159 Mass. at 561-562, 35 N.E. at 80.
........
Here, one party is attempting to prove that an invention was actually made at a point in time prior to its being reduced to drawings. Moreover, the rationale put forth by the Massachusetts court in Lamson v. Martin, supra, is not one of evidentiary convenience; it is an acknowledgement that an "invention" is generally thought to be more than a thought in the inventor's head. Finally, Lamson and United States v. Dubilier Condenser Corp., supra, were not priority disputes between two would-be patent-holders; they were both cases in which the patent-holder attempted to prove he made the invention at a point in time later than that at which another party, asserting rights to the patent, claimed *219 the invention was made. In sum, it would seem that the Massachusetts cases and the patent law cases hold that an idea becomes an "invention" only when it is reduced to some tangible form. No such "invention" existed when Freeman left Rockwood's employ. Cf. Goodyear Tire & Rubber Co. of Akron, Ohio v. Miller, 22 F.2d 353 (9th Cir.1927). [443 F.2d at 210-11]
The court in footnote 4 observed that Freeman's contract made no reference to inventions where he was a coinventor and hence they might be excluded. It also observed in footnote 6 that "made" was used in the context of "worked out." That court also concluded that a skilled mechanic at the time Freeman left Rockwood could not have built anything, for even Freeman had not worked out the idea so that anyone could follow it.
In Jamesbury, supra, and the Lamson decision cited therein, the inventor had made no sketches or drawings and had not done any model work at the relevant time. There was no embodiment of the practical means of application of the idea.
If such were the facts in this case, there would be some merit to Relis' contention, but not to the full extent he seeks to take it.
Based on the foregoing cases, this court concludes that where an inventor or inventors have conceived the basic ideas, have drawn the schematics for the electrical circuitry, have assembled the hardware to do the work, and have documented the means of executing the idea, there is invention even under the Massachusetts doctrine quoted above. The court concludes that the model does not have to be built to the point of a salable product to the end user without further work, as Relis contends. Such a standard is even more stringent than the patent laws. See Telephone Cases, supra; Bourdon v. Kraft, 113 F.2d 115, 27 CCPA 1408 (1940).
In terms of the contract with Curtiss-Wright, the relevant words are, "any and all inventions which I may make, or with respect to which I may be a joint inventor, while in the *220 employ of the Corporation ..." As explained hereafter, a coinventor necessarily implies that the work of at least one other was necessary to complete the work. Hence the court concludes that this contract, unlike the one in Jamesbury, supra, had to embrace rights less than ones which were fully patentable by themselves.
The court concludes that Relis was employed under a contract which provided that he would perform original and inventive development work as well as administrative functions, that he would assign all his right, title and interest in any inventions which he made either as an inventor or coinventor, while in the employ of Curtiss-Wright, and that he was to honor any request to assign his rights to patents as either inventor or coinventor while employed or thereafter.

2.
The activity reports prepared by Relis, as chief advanced design, to the chief engineer dated April 19, 1963 and April 24, 1963, state that work was progressing on the erase circuit design, initial patent applications were worked on and demonstrations of the Magdop system were being given to certain persons. The report dated April 24, 1963 states: "Design and headboard testing of erase circuitry is about 80% complete."
On February 28, 1963 a demonstration of the Magdop equipment produced document D-6A which, in turn, was the basis for the production of a copy, D-6B, by the readout system.
Reviewing the court's notes of the testimony, the proposed findings of counsel, the documents, drawings and photographs which are exhibits, and the patent application, the court concludes that the method of erasing magnetically recorded information is covered in Invention Disclosures 1638, dated November 15, 1962; 1589 dated July 13, 1962; 1590 dated July 12, 1962, and 1652 dated May 4, 1964, all of which are signed by Graf and Relis except 1590, which was signed by Graf and Andreaggi.
*221 Relis testified that the drawings for the circuitry were not done at Curtiss-Wright but were done in the preparation of the patent application. The court does not find his testimony credible. His own activity reports state that testing of erasing was going on.
The drawings attached to the Invention Disclosures show a drawing of the head type found in the patent application on Fig. 10.
The court finds from the credible testimony that the structure of Fig. 10 was built and tested experimentally at Curtiss-Wright. It is a head for recording and erasing.
In respect to Fig. 11, Graf testified that he had had prepared a handwritten sketch, P-20, in 1963. He further testified that this is the same circuit arrangement as appears in Fig. 11. He also testified that three sheets of sketches, P-86, P-87 and P-88, were prepared by him at Curtiss-Wright. He testified that these are the schematics for the circuit shown in Fig. 11. He also testified that he used P-20, P-86 and P-87 to build the actual hardware at Curtiss-Wright.
In respect to Fig. 12, which shows a flush code board, plaintiffs testified that this was conceived at Curtiss-Wright. Such a flush code board is shown in a photograph taken during the Magdop project at Curtiss-Wright.
Andreaggi testified that Drawing WH-577 was prepared about October 19, 1962 at Curtiss-Wright and that it schematically discloses the circuit for the flush circuit board shown as items 83 and 84 in Fig. 12. He also testified that Drawing WH-576 was prepared on or about October 16, 1962 at Curtiss-Wright and that it shows the equipment which is used for building the flush circuit board as items 83 and 84 in Fig. 12. These drawings bear the filled-in title blocks of Curtiss-Wright.
He also testified that he had prepared the drawing marked P-77 and that it discloses an apparatus for generating a specific code. He further testified that Drawing WH-579 was prepared *222 under his direction at Curtiss-Wright and that it discloses brush 81 in Fig. 21.
The court finds the testimony of Andreaggi and Graf credible. The court concludes that the basic recording and erasing concepts and the means to apply them in a practical way were developed at Curtiss-Wright before any assignment was made by Curtiss-Wright. The court finds that they were embodied in Invention Disclosures, sketches and demonstration equipment.
Relis urges that other items shown in the patent application were not made at Curtiss-Wright and hence were not part of Curtiss-Wright's proprietary rights, but were his as coinventor. The court considers them in the next point.
The court concludes that the inventions were made at Curtiss-Wright.

3.
In December 1963 Curtiss-Wright terminated Andreaggi's employment as part of a general cutback of its operations due to financial conditions. Andreaggi made an oral offer to purchase the equipment and rights in the Magdop project and stated that a responsible official of Curtiss-Wright accepted it. These events occurred in the early part of 1964.
Relis was out of the United States at the time. When he returned, he attempted to persuade Curtiss-Wright not to sell. He attempted to have Curtiss-Wright sell the package to him. It declined to do so because he was an employee.
On May 19, 1964, Relis executed an assignment which contained in relevant part:
... to Curtiss-Wright, a Delaware corporation, its successors and assigns, all my interest of whatever kind in and to each of and all the following Invention Disclosures bearing the Disclosure number and title indicated:

 Invention Disclosures
 Number Title
 1524[*] [Omitted]
 1541 "

*223
 1579 "
 1589 "
 1590 "
 1591 "
 1592 "
 1611 "
 1612 "
 1613 "
 1626 "
 1629 "
 1637 "
 1638 "

and I covenant and agree that I will, without expense to me, communicate to said Corporation, its successors and assigns and its or their representatives, any facts known to me respecting the above identified Invention Disclosures and testify in any legal proceedings, sign all lawful papers, execute all patent application papers relating thereto, make all rightful oaths and cooperate with said Corporation, its successors, assigns, and representatives, to obtain and enforce proper patent protection for the inventions of said Disclosures in all countries.
Curtiss-Wright terminated Relis' employment for financial reasons in 1965. On March 7, 1966 Relis executed a similar assignment with a similar covenant covering Invention Disclosures 1652, 1656 and 1657. These related to Magdop.
Relis specifically assigned his rights in the 16 Invention Disclosures listed above.
Relis urges that Invention Disclosure 1541 is clearly identified in D-5A and that Invention Disclosure 1574, P-46, bears the same date as D-5. Relis therefore urges that the subject matter of the alleged seventeenth disclosure, D-5, was not assigned by him to Curtiss-Wright. He contends that 1541 encompasses only one disclosure and not two, and that since the second part of 1541 is D-5 and bears a later date, it cannot be encompassed by 1541. He concludes that there are 17 invention disclosures, of which he assigned only 16.
In a memo dated May 20, 1964 Relis urged Curtiss-Wright not to assign Invention Disclosures 1579, 1591 and 1592. This request was disregarded.
*224 A letter dated June 21, 1962, signed by Relis, transmitting Invention Disclosure 1541 shows that the disclosure is in two parts. They are called References A and B. These are D-5 and D-5A.
At trial the entire docket for 1541 was introduced. Mr. Behn, identified above, testified that these were the two components of Invention Disclosure 1541 and not two separate Invention Disclosures.
He further testified that the records show that each was assigned Invention Disclosure 1541. The purpose of the number is to call the matter to the attention of the patent department to evaluate the matter for patent protection.
In respect to the other disputes over numbers, the court, after reviewing the dockets, the Invention Disclosures, the letters of transmittal, and related exhibits as well as the testimony, is satisfied that there is no merit to Relis' position in respect to them. The evidence shows him to be incorrect. Behn, whom the court found credible and neutral, confirmed in his testimony that Relis was wrong.
In the middle of 1964 Andreaggi commenced suit against Curtiss-Wright for breach of contract. While Andreaggi was pursuing his appeal from an adverse judgment below, the matter was settled between Andreaggi and Curtiss-Wright by Andreaggi paying a sum of money.
On February 23, 1966 Andreaggi and Curtiss-Wright entered into a settlement agreement. Curtiss-Wright agreed to sell the equipment identified in paragraph 1(a) and in paragraph 1(b)
... to Andreaggi and Andreaggi agrees to purchase from Curtiss-Wright all of Curtiss-Wright's right, title and interest in and to inventions made by Curtiss-Wright's employees, during their employment with Curtiss-Wright, relating to Curtiss-Wright's magnetic document processing (MAGDOP) device, which said inventions are listed in Schedule A attached hereto and made a part hereof, and in and to any and all patent applications and patents which may be based on said inventions, as fully and completely as might have been held by Curtiss-Wright, had this sale not been made.

*225 In furtherance of this sale of its right, title and interest in and to said inventions, Curtiss-Wright will deliver to Andreaggi on the closing date hereof all of its files, records and papers relating to each of said inventions. Curtiss-Wright makes no representation that it has accurate knowledge as to which of its employees made any of said inventions and this sale is made subject to the understanding that:
........
(2) Curtiss-Wright has no obligation to obtain or assist Andreaggi in obtaining the execution of any papers by its employees or former employees deemed by Andreaggi to be necessary or desirable for the filing of patent applications on said inventions, but Curtiss-Wright agrees that it will execute such papers prepared by Andreaggi for execution by Curtiss-Wright and which appear reasonably necessary to effectuate this sale of said inventions.
The other provisions are irrelevant to the resolution of the issues before the court. Schedule A listed the following numbers for Invention Disclosures and the descriptive headings (which the court has omitted):

 1541 1613
 1579 1626
 1589 1629
 1590 1637
 1591 1638
 1592 1652
 1611 1656
 1612 1657

Three days after Relis executed the supplemental assignment of Invention Disclosures to Curtiss-Wright, dated March 7, 1966, Curtiss-Wright executed an assignment of all the Invention Disclosures for Magdop, dated March 10, 1966, and a bill of sale for the equipment.
The assignment in relevant part stated:
... Curtiss-Wright ... hereby sells and assigns to Joseph R. Andreaggi ... all of its right, title and interest in, to and under all inventions contained in the following Invention Disclosures, bearing the Disclosure number and title indicated, and, in, to and under any and all applications for patent that may be filed based on any of said inventions, all as fully and completely as might *226 have been held by Curtiss-Wright Corporation had this sale and assignment not been made:

 Invention Disclosures:
Number Title
 1541 [omitted]
 1579 "
 1589 "
 1590 "
 1591 "
 1592 "
 1611 "
 1612 "
 1613 "
 1626 "
 1629 "
 1637 "
 1638 "
 1652 "
 1656 "
 1657 "

In furtherance of this sale and assignment Curtiss-Wright Corporation is transferring to Joseph R. Andreaggi, as of the date hereof, all of its files and records with respect to said inventions and Curtiss-Wright Corporation agrees that it will execute all further papers, prepared at the expense of Joseph R. Andreaggi and considered reasonably necessary to effectuate this assignment.
The bill of sale was a standard form on an "as is" and with "all faults" basis for the equipment itemized therein.
The court finds that as of March 10, 1966 Curtiss-Wright had not only the agreement of Relis set forth in its employment agreement but his undertakings in the Relis assignments, P-83 and P-84. The latter expressly stated that Relis would cooperate with the successors and assigns of Curtiss-Wright.
Relis urges that his contract of employment with Curtiss-Wright was one for personal services and hence any rights under it are not assignable. Flemington Bd. of Ed. v. State Bd. of Ed., 81 N.J.L. 211 (Sup.Ct. 1911), aff'd o.b. sub nom. Glazer v. Flemington, 85 N.J.L. 384 (E. & A. 1913). In that case the Supreme Court held that the contract for a teacher who had contracted to work for the Board of Education of Raritan *227 Township on the day the Legislature authorized the transfer of part of Raritan Township to a new municipal corporation, Flemington, was not an obligation of the new municipality, in part on the grounds that it was a contract for personal services, the contract was conditional upon the teacher being subject to the control of Raritan, and not covered under the applicable statute.
This court regards that case as distinguishable on its facts. The employment contract between Curtiss-Wright and Relis, so far as relevant here, pertained to property rights in inventions. Once Curtiss-Wright acquired, or had a right to acquire, the inventions, there was no element of personal service involved but only property rights. If Curtiss-Wright had acquired a patent on the inventions, Curtiss-Wright would have been free to sell it. There is no limitation on the right of Curtiss-Wright to dispose of its property acquired under the contract.
But even if the court accepted Relis' argument, which it does not, Relis in the subsequent assignments gave Curtiss-Wright the power to assign by recognizing assignees in those documents.
Relis urges that his assignments to Curtiss-Wright, P-83 and P-84, are not as broad as the assignment from Curtiss-Wright to Andreaggi in that he did not assign his rights to "inventions" in the Invention Disclosures but only to the Invention Disclosures; hence the omission of the word "inventions" means he preserved his right to them. He cites the lower court opinion in Misani v. Ortho Pharmaceutical Corp., 83 N.J. Super. 1, 14 (App.Div. 1964), and Vargas v. Esquire, Inc., 164 F.2d 522 (7 Cir.1947), cited in the former case for the proposition that where a creative person has not granted a right or has not reserved a right, depending on the facts, an assignment either does not grant or does not reserve the right. This court finds those cases not applicable.
*228 Relis simply overlooks his covenant that he will testify in any legal proceedings about any facts contained in the Invention Disclosures, sign patent applications and cooperate in getting "proper patent protection for the inventions of said Disclosures in all countries." All provisions of a document must be read, and should be harmonized where possible, in interpreting a document. There is no purpose to the covenant unless the assignor intended to convey his rights in the inventions, for they alone can be the subject of a patent. United States v. Dubilier Condenser Corp. and Telephone Cases, both supra. The court concludes that Relis did assign his rights to the inventions.
Relis urges that Andreaggi and Graf cannot be allowed to specifically enforce whatever rights they may have against him because Curtiss-Wright abandoned the project. He cites J.A. Migel, Inc. v. Bachofen, 96 N.J. Eq. 608 (E. & A. 1924).
In that case Migel had employed Bachofen as assistant superintendent in its silk fabric plant in charge of experiments to develop new designs of silk. Migel used a Velcut machine to make velvet. This required cutting certain threats to get the velvet appearance. Bachofen undertook to design a boom attachment that would produce similar results at less cost without interfering with the boom patent.
Bachofen signed a contract with Migel under which Migel was to provide a loom, equipment and up to $400 for Bachofen to do his work. Bachofen agreed to assign any patent rights to Migel in return for a payment of five cents a yard for all goods produced.
A month later, after Migel had spent $900 on the project, it discharged Bachofen. Migel then obtained the patents for the Velcut machine. Bachofen continued to experiment on his own. He spent $10,000 of his own money. About a year later he applied for and received a patent on the new method.
Migel also increased the number of Velcut machines it had from 10 to 120.
*229 Migel obtained a judgment directing Bachofen to assign the patent. The Court of Errors and Appeals reversed and said that Migel sought the patent, not to use it and pay royalties on it so that Bachofen would have the benefit of his work, but to eliminate potential competition for the Velcut patent and deny royalties.
A court of equity ought not to lend its aid in the carrying into execution a scheme so manifestly unfair to the defendant, and for this reason a decree of specific performance should have been denied. The remedy by specific performance is discretionary; the question is not what must the court do, but what, in view of all the circumstances of the case in judgment, should it do to further justice, and, where the enforcement of the contract will be attended with great hardship or manifest injustice to the defendant, the court should always refuse its aid. [Id. at 611-12; citations omitted]
From the testimony and the documents, Curtiss-Wright in 1963 had an evaluation made by an outside organization as to the marketing potential for the product, the capital costs of entering the market, and its potential competitors. The evidence warrants a finding that Curtiss-Wright found the capital costs to be high and the competition fierce. At that time Curtiss-Wright was encountering financial difficulties. It was retrenching. It concluded that the project should not be funded any further.
Curtiss-Wright did look for a buyer but found none. In looking for a buyer Curtiss-Wright did not abandon its proprietary rights. It sought to salvage part of its investment of over $200,000. It preserved its rights to apply for patents and, so far as this record reveals, it preserved its proprietary rights in the Invention Disclosures.
The court finds that Relis then, and since then, has considered the rights valuable.
For whatever reasons Curtiss-Wright found acceptable, it settled with Andreaggi and sold its rights to him. Unlike Migel, Curtiss-Wright helped one, if not two, of the coinventors to complete the patent process in the United States and four other *230 countries. Curtiss-Wright has subsequently quitclaimed all of its rights to plaintiffs.
Only Relis blocks the way to the ability to use the patents. This not on the ground that he spent his money, made the necessary alleged further developments so a patent could issue, and obtained the patents, but that the plaintiffs did.
The court finds no merit in the argument based on abandonment.
Relis' factual contention that he has shown that there were further developments made by plaintiffs in which he had rights as a coinventor, but which Curtiss-Wright did not have rights in because they were made after termination of his employment, Jamesbury Corp. v. Worcester Valve Co., supra, and his conclusion that he has no duty to assign, appears to present a fact question but actually presents only a legal question on this record.
Relis cites DeLaski & Thropp C.W.T. Co. v. William R. Thropp & Sons Co., 218 F. 458, 464 (D.N.J. 1914), aff'd 226 F. 941 (3 Cir.1915) for the definition of a joint inventor. The Circuit Court of Appeals said:
[I]t is not to be thought nor by the law required, that the inventive conceptions of two inventors shall develop simultaneously. One may conceive a general or imperfect outline of an entirely novel thing, which, without the conception of another developing it and giving it body, might never amount to invention but if the conceptions of one supplement and complement the conceptions of the other, the result might be invention and therefore joint invention. [226 F. at 949].
He then cites U.S. Ind. Inc. v. Norton Co., 184 USPQ 187 (N.D.N.Y. 1974), which deals with a situation where one person is working on a project with another, the latter of whom is joined by a third person in a later period who never worked with the first. Because the first may be added to the patent as a joint inventor with the second and third, Relis cites this case to show that one may be a joint inventor in later work, even though one made no actual contribution in the later period. See also, *231 Norton Co. v. Carborundum Co., 530 F.2d 435, 444, n. 25 (1 Cir.1976).
Relis then urges that a former employer has no rights in a later invention where an employee conceived an idea but did not reduce it to practice while working for his former employer. Jamesbury Corp., supra. Since Graf and Andreaggi made further improvements which perfected the invention after termination of the employment of all three, Curtiss-Wright has no claim to the further improvements but he as a coinventor or joint inventor does.
No party disputes Relis' status as joint inventor. Indeed, the oath to the patent application signed by all three bears witness to that fact.
In Jamesbury Corp., supra, the courts found that within the terms of the employment contract all tangible embodiments of the idea, whether in sketches, drawings or models, were done after termination of employment by the single inventor and hence outside the scope of the employment contract. As pointed out above, the First Circuit questioned whether the employer had rights to an incomplete invention of a coinventor under the terms of the employment contract.
The court finds that Relis did not sustain his burden of proving that there were further developments. Under (2) above the court has dealt with the most significant ones. For the record, it adopts plaintiffs' proposed findings of fact numbers 69 to 170. It attaches them as an appendix in order to shorten this decision. [Appendix omitted from published opinion.]
The court finds that Andreaggi and Graf did package some of the wiring to give the apparatus a cleaner appearance. But it finds that there were no new inventions.
But even if the court is mistaken as to the factual findings, it concludes that based on the documentation, the contract of employment and Relis' assignments dated May 19, 1964 and March 7, 1966, Relis as a matter of law does not have the right he claims he has.
*232 In the written employment contract, Relis agreed:
2.... to communicate promptly to the corporation and, upon request, to assign to it all right, title and interest in and to any and all inventions which I may make, or with respect to which I may be a joint inventor, while in the employ of the Corporation....
In the abovementioned assignments Relis assigned:
... to Curtiss-Wright ... its successors and assigns, all my interest of whatever kind in and to each of and all the following Invention Disclosures
........
and I covenant and agree that I will ... sign all lawful papers, execute all patent applications, papers relating thereto ... and cooperate with said Corporation, its successors and assigns and representatives to obtain and enforce proper patent protection for the invention of said Invention Disclosures in all countries.
The only status that Relis has in the patents as a coinventor arose while he was employed by Curtiss-Wright. He claims no other status. For reasons heretofore stated, the court has concluded that under the assignments he assigned all of his interest of whatever kind in and to each of the inventions in the Invention Disclosures. The latter necessarily included his rights both as an inventor and coinventor, because all includes each of the two categories.
The last of the Relis assignments was made by March 7, 1966, before the Curtiss-Wright assignment of March 10, 1966 to Andreaggi was made. Assuming, arguendo, that plaintiffs made further developments, they could only have been made after Relis had assigned his rights as coinventor to Curtiss-Wright and it assigned such rights to plaintiffs. Accordingly, if such further developments were made, Relis had no rights in them.
Relis explains that he made the assignment in March 1966 after his termination by Curtiss-Wright because he did not want to jeopardize certain benefits he was receiving. The court concludes that he was under a contractual duty as well as one of *233 good faith to make the assignment. The court need not speculate as to whether Relis made the assignment because he was afraid of losing his benefits or because he would have broken his contract.
This court concludes that for the reasons heretofore set forth, following the assignment by Curtiss-Wright plaintiffs owned all the rights Andreaggi, Graf, Relis and Curtiss-Wright had as inventors, coinventors and owners of proprietary information in the Invention Disclosures.

4.
Unlike the agreement to assign an interest in a patent, Marcalus Mfg. Co. v. Sullivan and International Pulverizing Corp. v. Kidwell, both supra, the assignment of an interest in a patent application or a patent must be in writing. 35 U.S.C.A. § 261 in relevant part provides:
... [a]pplications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.
In Harrigan v. Smith, 57 N.J. Eq. 635 (1899), the Court of Errors and Appeals in a unanimous decision reversing denial of specific performance of an oral agreement to assign an interest in a patent said:
The decree appealed from should be reversed and a new decree be made, simply giving to the complainant the formal assignment to which we adjudge him to be entitled, on terms that he pay into court or to a master who shall supervise the execution of the instrument the sum of $350 without interest. [at 644]
That court described the right enforced as follows:
An inchoate right in a patentable invention is a subject of lawful sale, and a sale of such a right carries with it a corresponding interest in the patent when letters are afterwards issued. Clum v. Brewer, 2 Curt. [C.C.] 506, Fed.Cas.No. 2,909, approved in Hendrie v. Sayles, 98 U.S. 546 [25 L.Ed. 176]. In Clum v. Brewer it was said by [Mr. Justice Curtis] that, if the purchaser does not get the *234 legal title, (a jus in re), he certainly does get an equitable title, (a jus ad rem), and * * * can at any time demand a formal assignment of his interest in the patent. In the case that was then before the court the written contract provided, in terms, for an assignment of the purchased interest, when the patent should issue; but even without such an agreement, an obligation to assign is necessarily implied in a sale of an interest in such an invention. [at 640, 42 A. at 579, emphasis supplied].
The same principles apply under an employment contract where an employee agrees to assign inventions. See Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560 (1924); Misani v. Ortho Pharmaceutical Corp., supra, 44 N.J. at 554.
This court has heretofore found that plaintiffs, by reason of the March 10, 1966 assignment from Curtiss-Wright, had acquired all of the rights which it had earlier acquired from Relis both in the inventions and in his capacity as inventor and coinventor.
Relis urges that the rights are unenforceable because (i) Curtiss-Wright had a right to enforce them only while he was an employee and (ii) Curtiss-Wright "fired" him.
The court has heretofore stated that it construes the words "while in the employ of the Corporation" to limit the period within which the inventions, subject to the duty to assign, were made, and not to set a limit to the time within which a request to assign must be made. If Relis' argument were sound, the same limitation would apply to any reissues or extensions of the patent. In such circumstances the employer could only protect itself by keeping the employee on the payroll. Yet the contract is terminable at will.
In respect to "firing," Relis admitted in his testimony that he was terminated for overall corporate reasons. He continued to receive certain benefits. He has produced no testimony, let alone evidence, that the common employer fired the three coinventors to deprive them of the fruits of their inventive efforts. Indeed, he expressly retracted earlier statements that Graf and *235 Andreaggi were "fired" or were employees of little worth. The court finds no merit in this defense.
Since Relis did not sign any assignment of the patent rights when the application was filed, the court finds that when the basic patent issued, plaintiffs had a right to the assignment of that patent, the divisional patents and the foreign patents based upon the United States patent application.

5.
Relis points out that plaintiffs obtained their assignment in March 1966 but did not file the patent application until 1972. The complaint in this action was not filed until November 17, 1975.
Relis urges that the claim is based on contract rights, and under N.J.S.A. 2A:14-1 any such claim is barred after six years. He also argues that even if the claim is deemed an equitable one, equity follows the law in determining when a claim is barred. Dunham v. Adams, 82 N.J. Eq. 265 (Ch. 1913).
Further, plaintiffs are seeking specific performance; hence the long period of delay should be considered. Gardner Valve Mfg. Co. v. Halyburton, 87 N.J. Eq. 689 (E. & A. 1917); Harrigan v. Smith, supra; Kimberly Corp. v. Hartley Pen Co., 237 F.2d 294 (9 Cir.1956). Relis contends in his brief that if plaintiffs had proceeded sooner, then
... defendant would have remembered that he took with him from Curtiss-Wright some activity note books which he later failed to recall, leading to an attack upon his credibility which prejudiced him. Similar attacks on his credibility resulted from other failures of recollection so many years later ...
Therefore, Relis concludes that plaintiffs are barred by laches.
For purposes of determining when a cause of action accrues so that the applicable period of limitation commences to run, the relevant question is when did the party seeking to bring *236 the action have an enforceable right. E.g., Guerin v. Cassidy, 38 N.J. Super. 454 (Ch.Div. 1955). In that case the executor sued on a writing dated November 18, 1948 to recover a $3,000 loan reflected therein. In respect to the defense based on the six-year statute of limitations the court said:
In effect, it is a promise to pay a sum certain, when the obligor is financially able to pay. The statute of limitations does not commence to run until a cause of action arises. Until the debt was due and payable, no cause of action had accrued. (citations omitted  ed.) Since the debt is not due until the defendant is capable of paying, the statute does not commence to run until at least that time. There is no proof which would warrant the conclusion that a period of six years has elapsed since the debt became due, and this defense is held to be without merit. [at 460]
The original inventor or inventors, subject to certain exceptions not relevant here, must sign the patent application. 35 U.S.C.A. § 111. The assignee of the patent rights cannot do so. 69 C.J.S. Patents § 84. If no patent ever issued, a party facing opposition would be reluctant to incur the expense of litigation to obtain a document of questionable use.
The court finds that Relis, from the outset in 1964, has demonstrated hostility to plaintiffs.
The court finds that, on the facts herein, the issuance of the divisional patents was the first event from which the period of limitations should commence to run. At that time plaintiffs knew that they had patents in which another could assert an interest. They did commence this action within two years, not six years, of that date. The court concludes that the statute of limitations is not a defense.
Counsel for Relis cites Harrigan v. Smith and Gardner Valve Mfg. Co. v Halyburton, both supra, to show that the courts will not specifically enforce a contract to assign a patent where the delay was as short as five years (Harrigan) or seven years (Gardner Valve Mfg. Co.).
*237 As heretofore, stated, the Court of Errors and Appeals reversed the trial court for not granting specific performance in Harrigan v. Smith. The court did hold on the facts that no accounting should be allowed because plaintiff was not entitled to one as a matter of law and because of the passage of time.
In Gardner Valve Mfg. Co., supra, the court held that plaintiff had issued common stock for an assignment of the patent rights but had not valued the rights at the time. The court found that the patent rights were worthless at the time. It concluded that the contract violated the Corporation Act and was unenforceable as a matter of public policy. It also held that the second buyer had searched the records of the patent office and found no assignment, had no knowledge of the prior assignment, and had expended substantial sums to develop the invention. It also conclude that plaintiff was barred by laches.
The record establishes that plaintiffs, after the settlement with Curtiss-Wright, obtained space to house the equipment. On the recommendation of their present patent attorney, they obtained the services of another patent attorney to file the application. After some effort, probably due to financial differences and personality differences, there was a parting of the ways between him and plaintiffs. They returned to their present patent attorney.
Andreaggi is employed as an inventor and has patents. He knew his present patent attorney from working for a common employer. The patent attorney then undertook to do the patent application work himself on his own time and without imposing financial problems. He completed the work and filed the patent application in 1972.
The court finds that plaintiffs did not delay. They did not conceal anything.
While the patent was pending they asked Relis for an assignment. He was evasive in his answers.
*238 When the patent issued, Relis demanded to see the Invention Disclosures so that he could compare them to the patent application and the patent to determine whether there was any gap.
At that time Relis was operating his own consulting business in electronics. The Invention Disclosures do contain material not disclosed in the patent application. Plaintiffs refused to make them available without safeguards. Relis refused the safeguards and refused the assignment.
In this action Relis contended that he could not answer certain interrogatories without examining the Invention Disclosures. The court ordered that he examine them in the presence of counsel for both sides.
It was later learned that he then had the original signed copies of some of the Invention Disclosures that he insisted upon seeing before he could answer the interrogatories.
The court finds that neither the doctrine of laches nor estoppel is available as a defense. The only prejudice defendant points to is that he allegedly forgot that he had taken the common employer's confidential information without authority. In civil terms, he converted it.
Having seen the witness on the stand, heard endless motions on discovery in which various excuses and reasons were advanced as to why depositions could not be taken, interrogatories not answered, etc., etc., the court does not accept as credible the explanation that he forgot.
The court concludes that plaintiffs have enforceable claims for relief.

6.
Plaintiffs are entitled to an order directing Relis to assign all his rights in the patents in a writing sufficient to satisfy the requirements of all countries for filing under the patent laws.
The patent attorney who handled the filing of the patent applications testified to added work and expense incurred by *239 lack of cooperation from Relis. He produced documentation to back up the time and the amounts spent for added filing fees. The amount is $600. This resulted from Relis' breach of his duties under his contract with the assignments to Curtiss-Wright, of which plaintiffs were the assignees.
Plaintiffs have asserted a claim for conversion of property.
Relis testified that he had the original signed copies of Invention Disclosures 1656 and 1657 and the letter of transmittal.
In answer to interrogatories Relis stated he kept engineering note books at Curtiss-Wright. On the stand Relis denied he kept engineering note books but kept only a personal diary.
P-180 is a collection of documents obtained from Relis. Behn, Curtiss-Wright's patent counsel, identified them as property of Curtiss-Wright related to Magdop except for a cover letter from defense counsel. He had no objection to plaintiffs receiving them except for the appropriation request dated November 5, 1962.
The court will enter an order directing that the original of the Invention Disclosures, letter of transmittal and the other documents identified by Behn be turned over by Relis to plaintiffs.
The court bifurcated the question of money damages. In an attempt to expedite what has been an unduly long trial and proceeding, the court requested counsel for plaintiffs to submit a proffer of proof on damages and a memorandum of law. Defendant has submitted an answering memorandum of law. After careful review of those memoranda, the court will conduct a supplemental pretrial on the damage issue, including the issue of punitive damages.
Plaintiffs are entitled to costs.
NOTES
[*] [Does not relate to Magdop]