**MOSS ROSENBERG VERFT, A/S of Stavanger, Norway and Avondale Shipyards, Inc., P.O. Box 50280, New Orleans, Louisiana 70151, Plaintiffs,**

v.

**GENERAL DYNAMICS CORPORATION, Defendant.**

Civ. A. No. 76–3025–C.

United States District Court,
D. Massachusetts.

March 20, 1979.

Richard J. Innis, Hale & Dorr, Boston, Mass., James P. Thompson, Haight, Gardner, Poor & Havens, Thomas R. H. Howarth, New York City, Thomas S. Grilk, Boston, Mass., for plaintiffs.

Allan J. Topol, Covington & Burling, Washington, D.C., Lewis H. Weinstein, Foley, Hoag & Eliot, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action which came on for a nonjury trial. After trial, I find and rule as follows:

On April 14, 1971 the Norwegian business concern of Moss-Rosenberg Verft, A/S (hereinafter Moss) and General Dynamics Corporation (hereinafter General Dynamics), a Delaware Corporation which owns and operates a shipyard in Quincy, Massachusetts, entered into a licensing contract. Under the terms of the agreement, Moss granted to General Dynamics an exclusive, but conditional, license to use Moss' design and other information under Moss' control "to make, have made, sell, lease, and use" liquified natural gas (LNG) tankers with a cargo capacity of 130,000 m3 or less. The agreement also gave a non-exclusive license to General Dynamics to make and sell tankers with a cargo capacity greater than 130,-000 m3. The design in question was a spherical cargo tank system developed by Moss which General Dynamics was then eager to build and market.

Almost five years later in 1976, Moss and Avondale Shipyards, Inc. (hereinafter Avondale), a Louisiana corporation, agreed to a contract under the terms of which Avondale was to become a non-exclusive licensee of the Moss design. Under the 1976 agreement Moss granted Avondale a license to use Moss' design in constructing

vessels with a cargo capacity of more than 130,000 m3. On its face, therefore, the contract does not conflict with any of the exclusivity rights claimed by General Dynamics under its 1971 contract.

In March 1976, before the agreement between Moss and Avondale was executed, General Dynamics informed Moss of its opposition to the awarding of that contract. General Dynamics claimed that under the terms of the 1971 contract all improvements made by General Dynamics on the Moss design were the property of General Dynamics and that since such improvements were no longer severable from the Moss design, the grant of any additional license by Moss would result in a release of General Dynamics' proprietary information. General Dynamics informed Moss that it would hold Moss strictly accountable for any damages it suffered as a result of such a release.

Moss filed this case primarily in the form of an action for declaratory judgment in the United States District Court for the District of Columbia on June 4, 1976. In response to the complaint, General Dynamics raised a number of defenses and also filed several counterclaims. The case was transferred to this Court from the District of Columbia on August 13, 1976, on the basis of General Dynamics' motion under 28 U.S.C.A. § 1404(a).

Moss and Avondale proceeded to execute their contract and Avondale is now contemplating the construction of an LNG tankship with a diameter of 121 feet 2¾ inches. General Dynamics maintains that such a tankship will have a cargo capacity of less than 130,000 m3 and therefore its construction will violate the exclusivity provision of the 1971 contract. Consequently, in its first counterclaim General Dynamics seeks to enjoin Moss and Avondale from proceeding with their licensing agreement.

Over a two-year period, extensive discovery and numerous pretrial motions, the necessity of much of which appears highly dubious, have resulted in a voluminous file. During the trial, on motion of the plaintiff, the Court dismissed the complaint for declaratory judgment without prejudice.

Thus, after weeding through this paper jungle, the only issues remaining for the court's determination are those raised by General Dynamics' first counterclaim, namely: (1) whether the exclusivity provision of the 1971 contract is still in effect; and, if so, (2) whether the proposed Avondale vessel violates that provision.

Moss correctly points out that the exclusivity arrangement was conditional and contends that it was, in fact, terminated in 1972, before Moss entered into its contract with Avondale. It further maintains that even if the court should rule that the exclusivity provision is still operative, that the cargo capacity of the proposed Avondale vessel does not violate the exclusivity provision. In so arguing Moss contends that cargo capacity is computed by determining 100% of the interior volume at cargo temperature.

General Dynamics denies that the exclusivity of its license has been terminated and maintains that the proposed Avondale vessel is in violation of the 1971 contract between Moss and General Dynamics. In support of its argument, General Dynamics defines cargo capacity as the maximum volume to which a cargo tank may be loaded. Under the theory set forth by General Dynamics, allowance for ullage or vapor must be made in determining the cargo capacity of a vessel.

Turning first to a consideration of General Dynamics' claim of exclusivity, an examination of the 1971 contract establishes that initially, as to all tankships with a cargo capacity of 130,000 m3 or less, the license was indeed intended by the parties to be exclusive. However, I rule that the continued existence of that exclusivity was rendered conditional by a limiting provision in the contract which provided:

The exclusivity granted herein for Tankships having a cargo capacity of 130,000 m3 or less shall continue for the life of this agreement and any extensions hereof, provided:

(a) Dynamics shall have entered into a contract or contracts for the construction of three or more Tankships on or before 31 December 1971, or

(b) Moss is satisfied that Dynamics is aggressively and successfully pursuing the LNG tankship market and continues to possess the capacity to satisfy a substantial portion for the market.

The contract also set forth the procedure by which Moss could terminate the conditional exclusivity

If subsequent to 31 December 1971, Moss should determine for good and sufficient reason that Dynamics is not actively and successfully pursuing the market for Moss' LNG tankships, or that Dynamics does not have the capacity or capability of satisfying a substantial part of such market, Moss may, after consultation with Dynamics, enter into license agreements with other U.S. shipyards for Tankships of 130,000 m3 or less. Moss shall not, however, enter into such other license agreements without giving Dynamics a reasonable opportunity to refute such determination.

I find that as of December 31, 1971 General Dynamics had still not entered a single contract for the construction of an LNG tankship, and, indeed, in 1972 it was considering the possibility of closing its Quincy shipyard. I also find that Moss was not satisfied with General Dynamics' pursuit of the LNG tankship market and in a telex dated March 15, 1972 it conveyed that dissatisfaction to General Dynamics. The telex expressed Moss' doubt that General Dynamics was pursuing the market in an aggressive or successful manner or that General Dynamics had the capacity to satisfy a substantial portion of that market and indicated its intention of licensing other U.S. shipyards.

General Dynamics responded in a telex dated March 21, 1972. It informed Moss that it would vigorously oppose any attempt by Moss to license other U.S. shipyards.

On October 19, 1972 Moss notified General Dynamics that after full discussion between the parties Moss had concluded that its design should be made available to other interested shipyards. It unequivocally stated that it was not bound by the exclusivity provision of the 1971 contract, but also stated that it would temporarily refrain from licensing the construction of ships with a cargo capacity of 130,000 m3 or less in order to maintain harmony between Moss and General Dynamics.

I rule that the exclusivity provision of the 1971 contract was terminated by the March 15, 1972 telex from Moss to General Dynamics. I further rule that if the March telex was inadequate to effect a termination of the exclusivity then, in that case, the October 19, 1972 communication terminated any exclusivity granted to General Dynamics.

It is clearly set out in the terms of the 1971 contract that the exclusivity would continue only so long as Moss remained satisfied with General Dynamics' performance. I find that when Moss terminated the provision it was genuinely dissatisfied with General Dynamics' performance, and I further find that it acted reasonably and in good faith.

The fact that Moss voluntarily refrained from entering additional licensing agreements for any length of time thereafter evidences its goodwill toward General Dynamics and its desire to maintain harmony between the parties. In light of the October 19, 1972 communication, it should not be considered a tacit recognition of the continued validity of the exclusivity provision.

 In addition, as a separate and independent ground for denying relief on the basis of General Dynamics' counterclaim, I find and rule that the proposed Avondale vessel would not violate the exclusivity provision of the contract. Even assuming for purposes of this portion of the Opinion that the exclusivity provision is still in effect, I find that in the tankship-construction trade and maritime industry "cargo capacity" means 100% of interior volume, and I further find that it was understood to have such a meaning at the time of the execution of the contract in issue.

I find that The Liquified Gas Carrier Register for 1975, a publication by H. Clarkson and Co., Ltd., a brokerage company with extensive experience in gas trade, defined cargo capacity as 100% of the tank's interior volume. I further find that Moss

has sold seven LNG tankers to five different owners and that in each transaction cargo capacity was determined by calculating 100% of interior volume in the cold condition. This is consistent with the fact that in 1971 General Dynamics listed the cargo capacity of four Moss vessels at 100% of the interior volume of those vessels.

"If there is a plain, ordinary and proper meaning of a term, that is evidence of how the parties intended to use that term. Similarly trade or business usage is also relevant." *Jamesbury Corporation v. Worcester Valve Company,* 443 F.2d 205 (1st Cir. 1971). Furthermore within the agreement itself the terms cargo capacity and size are used synonymously.

Based on the evidence adduced at trial, therefore, I find that the term "cargo capacity," as used in the contract, means 100% of the interior volume at cargo temperature. The cargo capacity of the proposed Avondale vessel is, therefore, 130,660 m3 and will not violate the conditional exclusivity provision, assuming it is still operative.

Accordingly, an Order will be entered dismissing General Dynamics' counterclaim for the above-stated reasons.