CULLINET SOFTWARE, INC. *vs.* McCORMACK &
DODGE CORPORATION.

Norfolk. November 26, 1985. — December 3, 1986.

Present: DREBEN, SMITH, & FINE, JJ.

*Contract,* Construction of contract. *Evidence,* Extrinsic affecting writing,
Prior consistent statement.

Where, in an action arising out of a dispute between the parties to a computer
software license agreement as to the geographic scope of marketing
rights granted to the plaintiff, the judge's erroneous conclusion that the
language of the agreement was clear and unambiguous may have affected
the ultimate conclusion that he reached, and where the exclusion of
certain relevant evidence was prejudicial to the plaintiff in view of the
judge's findings, this court remanded the case for determination of the
intent of the parties as to the meaning of the disputed language at the
time they executed the agreement, or, if necessary, for determination
of what was the more reasonable interpretation, in light of the language
used in the agreement and all the attendant circumstances. [236-238]

CIVIL ACTION commenced in the Superior Court Department
on June 29, 1984.

The case was heard by *Alan J. Dimond,* J.

*Richard K. Donahue* (*Donald R. Ware* with him) for the
plaintiff.

*William A. Fenwick* of California (*Alice E. Richmond* with
him) for the defendant.

SMITH, J. In 1981, Cullinet Software, Inc. (Cullinet),[1] was
a Massachusetts corporation engaged in the development, ac-
quisition, and marketing of computer software products for

---

[1] In 1981 the plaintiff was known as Cullinane Database Systems, Inc.
Later it changed its name to Cullinet Software, Inc. For convenience, we
identify the plaintiff as "Cullinet" throughout this opinion.

business, financial, and commercial use. Its main product line centered on a database management system it had developed for use on IBM mainframe computers.[2] Cullinet's business, in 1981, extended throughout the world, and it had subsidiaries and marketing representatives in twenty-four different countries.

McCormack and Dodge (M & D) in 1981 was also a Massachusetts corporation. It was engaged in the development and marketing of applications software. Such software allows a computer to perform a specific function such as accounts payable or a general ledger analysis of financial information. One of M & D's products at the time was General Ledger (G/L Plus), a software system that performed general ledger accounting functions. That product was sold by M & D, both domestically and throughout the world.

In the spring of 1981, Cullinet approached M & D in an attempt to acquire rights to the G/L Plus system. Negotiations ensued leading to the signing of a software license agreement (Agreement) between the two companies on August 25, 1981. The Agreement was drafted by lawyers for Cullinet and included the following paragraph entitled "Recitals": "Licensor has developed the System (as defined in Section 1.7 hereof). [Cullinet] desires (a) to obtain rights to use and evaluate the System, (b) to receive consultation and advice as to the operation of the System with, and as to the integration of the System into, certain products licensed by [Cullinet] and its affiliates and (c) to obtain a non-exclusive license to market and sublicense the System throughout the United States of America and Canada, all upon the terms and conditions hereinafter set forth."

The Agreement provided that M & D would deliver to Cullinet a specific version ("Release 1.7") of M & D's G/L Plus system (System) and related technical information. Section 3.1 granted to Cullinet a non-exclusive license, limited to the United States and Canada, to use the System in connection with

---

[2] A database management system is designed to permit the user of a computer to store, update, and retrieve information in a computer in an organized and efficient fashion.

Cullinet's business, including the right "to make modifications to or improvements in the System for any purpose."[3] Another section (§ 3.2) granted Cullinet a non-exclusive license to market and sublicense the System to users of Cullinet database management systems, subject to certain limitations: Cullinet would market the System "only with an interface . . . to be used with a [Cullinet] database management system," and Cullinet would not implement any interface that could be used with products other than Cullinet's.[4]

Cullinet was given a "limited right" to use the name "McCormack & Dodge General Ledger Plus" for purpose of identifying the "source of the System." After February 28, 1982, Cullinet was prohibited from representing to users or prospects "that its version of the System [was] the same as [M & D's] version of the System."[5] M & D expressly retained its own rights to use and market the System and to grant such rights to others (§ 3.6). The Agreement included an integration clause which stated that the "Agreement contains the full understanding of the parties . . . and supersedes all prior understandings and writings relating thereto."

The controversy between the parties concerns the language in Article VI, which provides:

> "6.1 *Term.* The term of this Agreement shall be five years from the date hereof.
> "6.2 *Assignment of Rights to [Cullinet].* Upon the expiration of this Agreement pursuant to 6.1 above, Licensor shall automatically, by operation of this Agreement and

---

[3] The Agreement expressly provided that all of Cullinet's improvements and modifications to the System "shall be and remain the property of [Cullinet]."

[4] These limitations, according to the Agreement, would continue to bind Cullinet after the expiration of the Agreement in five years.

[5] The Agreement stated that, after February 28, 1982, Cullinet was not entitled to receive any of the "[i]mprovements, modifications, or other changes" to the System that M & D developed and released to its other customers. Cullinet, therefore, bought a "frozen" version of the System. M & D replaced Release 1.7 with a new version of G/L Plus on or about March 1, 1982.

without the execution of any further documents or the payment of any further consideration or the taking of any further action by Licensor or [Cullinet], assign to [Cullinet] all right, title and interest in and to the System sufficient to permit [Cullinet] to use and to sublicense the System, in perpetuity, without limitation, subject, however, to the Licensor's rights contained in [§] 3.6[6] of this Agreement; provided, however, that notwithstanding the foregoing, [Cullinet] will not during the term of this Agreement or thereafter implement any interface for the system to be used with any product other than a database management system marketed by [Cullinet]."

Shortly after the parties signed the Agreement, differences arose in regard to the interpretation of Article VI. It became apparent that each party considered the geographic scope of the agreement to be of crucial importance. Cullinet claimed worldwide rights while M & D argued that only United States and Canadian rights were involved. As a result of the dispute, Cullinet filed an action in the Superior Court against M & D. It contended that under the language of Article VI, at the expiration of the five-year term in § 6.1, it had the right to market the System worldwide. Cullinet sought a declaration to that effect. M & D, in its answer and counterclaim, contended that the Agreement barred Cullinet from marketing the System outside the United States and Canada forever.

Cullinet moved for partial summary judgment on its complaint, arguing that the language of the Agreement was clear and unambiguous and supported its interpretation that the geographic limitation would be removed at the end of five years. M & D also moved for summary judgment, asserting that its own interpretation was clear from the language of the Agree-

---

[6] Section 3.6 of the Agreement, referred to in § 6.2, states:

"Section 3.6 *Reservation of Rights by Licensor.* Notwithstanding anything herein to the contrary, Licensor shall have the rights to (i) use the System, (ii) market, and grant the right to use, the System directly to any Person, and (iii) grant to any Person the right to market and grant rights to use the System."

ment and that the rights were forever limited to the United States and Canada. After a hearing on the motions, a Superior Court judge ruled, in effect, that the language was not clear but instead was uncertain and equivocal on the disputed point. He ordered an evidentiary hearing to receive extrinsic evidence for the purpose of elucidating the terms of the Agreement. Pursuant to Mass.R.Civ.P. 42(b), 365 Mass. 805 (1974), he severed the issue raised by Cullinet's complaint from any other issues that might be raised by M & D's counterclaim.

At the four-day hearing, the parties introduced oral and documentary evidence in support of their respective interpretations of the Agreement. Cullinet maintained that the language in Article VI was clear that upon the expiration of the Agreement under § 6.1, new rights were granted to Cullinet under § 6.2, subject to certain limitations, none of a geographic nature. M & D on the other hand, contended that in the context of the Agreement "without limitation" had only a temporal and not a geographic meaning. It claimed that the Agreement did not contain any mention of worldwide rights and that none could be read into it by implication.

After the hearing, the judge filed a memorandum of decision that included his findings of fact, rulings of law, and order for judgment. Reversing, sub silentio, the ruling that he had made at the hearing on the motions, the judge now concluded that the language of the Agreement *was* clear and unambiguous. He stated that the language of the Agreement itself, "demonstrates without any substantial doubt that after August 31, 1986, the locus of Cullinet's rights continues to be the United States and Canada and does not extend beyond them."[7] In a separate section of the memorandum, he reviewed the extrinsic evidence introduced at the hearing and concluded that it "confirmed" his decision.

---

[7] The judge's exact language on this point is as follows: "The primary source of the meaning of the Agreement is, of course, the language of the document itself. I am satisfied that this language demonstrates without any substantial doubt that after August 31, 1986, the locus of Cullinet's rights continues to be the United States and Canada and does not extend beyond them."

Judgment entered in accordance with the judge's decision. Cullinet has appealed from that judgment. It claims that the judge erred in that he (1) misconstrued the language of the Agreement, (2) misused parol evidence to contradict terms of the Agreement, (3) made clearly erroneous findings of fact, and (4) wrongfully excluded certain evidence.

A reading of the Agreement demonstrates that the judge erred in his conclusion that the Agreement was clear and unambiguous on its face. An ambiguity exists because of the introductory language contained in the recitals clause quoted earlier and the language in §§ 6.1 and 6.2. As Cullinet suggests, a reasonable interpretation is that the agreement terminated after five years and that the new rights granted Cullinet in § 6.2 are without the limited geographical scope contained in the recitals and other parts of the Agreement. It is also reasonable to conclude, as M & D argues, that the recital clause sets the context for both §§ 6.1 and 6.2, and that if rights as important worldwide rights were intended to be granted, they would have been specifically mentioned.

We feel constrained to reverse the judgment and order a new trial. Because of our holding that there was an ambiguity in the Agreement, we do not fault the judge for receiving extrinsic evidence. See *Robert Indus. Inc.* v. *Spence,* 362 Mass. 751, 753 (1973), where the court stated that "there was no error in the admission of evidence of the facts and circumstances of the transaction, including the situation and relations of the parties, for the purpose of applying the terms of the written contract to the subject matter and removing and explaining any uncertainty or ambiguity which arose from such application." Also see *Rosen* v. *A-H, Inc.,* 17 Mass. App. Ct. 126, 128-129 (1983); 4 Williston, Contracts § 629 (3d ed. 1961 & Supp. 1986).

We do not reverse because we believe that the judge's ultimate conclusion was necessarily wrong. Rather, we do so for two reasons. First, we are concerned that the trial judge's erroneous conclusion that the language of the Agreement was clear and unambiguous may have affected the conclusion that

he reached based upon his consideration of the extrinsic evidence.

Second, he found that Cullinet, after execution of the Agreement, "made no claim to international rights and, indeed, recognized that the Agreement gave it none." Cullinet offered evidence of testimony of Mr. Robert N. Goldman, its senior vice president and chief negotiator of the Agreement, given in October, 1981, two months after the execution of the Agreement. The testimony was given in the presence of counsel for M & D in a law action brought against M & D by ABC Management Systems, Inc. Mr. Goldman testified that after five years Cullinet would be able to market the System outside the United States and Canada. The evidence was relevant, and excluding it was error, unless there were grounds for exclusion not apparent on this record. Once the judge decided to receive extrinsic evidence of the parties' negotiations and postexecution conduct, Goldman's testimony became admissible as bearing upon Cullinet's interpretation of the Agreement communicated to M & D shortly after the Agreement was executed. The testimony was also admissible as a prior consistent statement in the face of a strong suggestion of a recent contrivance. *Hewitt* v. *Corey,* 150 Mass. 445, 445-447 (1890). *Commonwealth* v. *Darden,* 5 Mass. App. Ct. 522, 528, 530 (1977). Liacos, Massachusetts Evidence 168-169 (5th ed. 1981). 4 Wigmore, Evidence § 1129 (Chadbourn rev. 1972 & Supp. 1986). Its exclusion was obviously prejudicial to Cullinet in view of the judge's findings.

The purpose of the remand is to determine the intent of the parties as to the meaning of the disputed language at the time that they executed the Agreement. It may be, however, that on remand, the judge will determine that, at the time of execution, each party had a different understanding as to the existence of worldwide rights at the end of the five-year period. If that should be his finding, it appears that in this case the parties were at such a stage of performance by the time the disagreement erupted that the Agreement could not be rescinded. In these circumstances, the judge would have to determine what was the more reasonable interpretation, in light of the language

used in the Agreement and all the attendant circumstances. *D. Federico Co.* v. *New Bedford Redevelopment Authy.*, 723 F.2d 122, 129 (1st Cir. 1983). *Jamesbury Corp.* v. *Worcester Valve Co.*, 443 F.2d 205, 210 n.7 (1st Cir. 1971). *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979). Restatement (Second) of Contracts § 204 comment d (1979).

The judgment is reversed, and the matter is remanded to the Superior Court for a new trial on the construction of § 6.2 and related provisions and for trial on the issues raised by M & D's counterclaim. We do not reach the other issues argued by Cullinet, as they should not arise at a new trial.

*Judgment reversed.*